NAMA HOLDINGS, LLC, Plaintiff,

v.

RELATED WORLD MARKET CEN-
TER, LLC and World Market Cen-
ter Venture, LLC, Defendants.

NAMA Holdings, LLC, Plaintiff,

v.

World Market Center Venture,
LLC, Defendant.

C.A. Nos. 2755–VCL, 2756–VCL.

Court of Chancery of Delaware,
New Castle County.

Submitted: March 28, 2007.
Decided: April 27, 2007.

420

Michael D. Goldman, Stephen C. Norman, Abigail M. LeGrow, Potter Anderson & Corroon, Wilmington, DE; Howard J. Rubinroit, Ronald C. Cohen, Sidley Austin, LLP, Los Angeles, CA, for NAMA Holdings, LLC.

Martin P. Tully, Kevin M. Coen, Morris Nichols Arsht & Tunnell, LLP, Wilmington, DE; Stacie E. Tobin, Jennifer M. Skaggs, DLA Piper US, LLP, Baltimore, MD, for Related World Market Center, LLC.

Gregory P. Williams, Daniel A. Dreisbach, Lisa Zwally Brown, Richards, Layton & Finger, P.A., Wilmington, DE; Leslie D. Corwin, Sophia Tsokos, Greenberg

Traurig, LLP, New York City, for World Market Center Venture, LLC.

## OPINION

LAMB, Vice Chancellor.

A limited liability company, acting in its capacity as an express third-party beneficiary, sues one of the managers of an entity in which it owns an indirect interest, as well as the entity itself, to enforce contractual provisions drafted for the LLC's benefit in the entity's operating agreement. The entity and its manager move to dismiss or stay the LLC's claims, relying primarily on certain arbitration clauses contained in both the operating agreement and in another pertinent agreement to which the LLC is a signatory. Because the disputes at issue do not come within the ambit of the arbitration language of the latter contract, and since the LLC cannot be equitably bound to the arbitration provisions of the former contract, those motions will be denied, and the LLC may press its contractual claims in this forum.

## I.

### A. The Parties

Pending before the court are two related cases—*NAMA Holdings, LLC v. World Market Center Venture, LLC*[1] (the "Inspection Action") and *NAMA Holdings, LLC v. Related World Market Center LLC & World Market Center Venture, LLC*[2] (the "Specific Performance Action"). The plaintiff in both cases is NAMA Holdings, LLC, a Nevada limited liability company. The defendant in the Inspection Action is World Market Center Venture, LLC ("Venture"), a Delaware limited liability company. Venture's co-defendant in the Specific Performance Action is Related World Market Center LLC ("Related"), a limited liability company organized under Delaware law.

### B. The Facts [3]

#### 1. The Parties' Relationship

At the heart of this dispute is the World Market Center ("WMC"), a multi-phase real estate development project in downtown Las Vegas, Nevada. The site is an extensive 57–acre showroom and convention complex catering to the home furnishings industry. Twice a year, WMC hosts the Las Vegas Market, an international trade show for retail furniture and design merchants.

WMC is being developed, built, and leased in several separate phases. Phase One debuted in July 2005, and its 1.3 million square feet of floor space is fully leased to over 270 merchants. Phase Two opened in January 2007 and is also fully leased. Phase Three will feature the largest showroom in the complex and is scheduled to open next year. By the time WMC is complete, investors will have poured more than $1.1 billion into the project.

WMC is owned and operated by Venture. Venture is jointly owned and jointly managed by Related and Network World Market Center, LLC ("Network"). Ven-

---

**1.** C.A. No. 2756, 2007 WL 844543 (Del. Ch. filed Feb. 27, 2007).

**2.** C.A. No. 2755 (Del. Ch. filed Feb. 27, 2007).

**3.** The facts are taken from the well pleaded allegations in the complaints and certain documents incorporated by reference. *In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del.1995) (noting that a court may consider documents "integral to the plaintiff's claim and incorporated in the complaint" in deciding a motion to dismiss). The court considers extrinsic facts in resolving the defendants' motions in Part III *infra* when doing so is appropriate under the relevant procedural standard.

ture is governed by the Amended and Restated Operating Agreement of World Market Center Venture, LLC (the "Venture Agreement").

Network is wholly owned by Alliance Network Holdings, LLC ("Alliance Holdings"). Alliance Holdings is wholly owned by Alliance Network, LLC ("Alliance Network"). NAMA is the principal investor in Alliance Network, having contributed approximately 70% of that entity's equity. Crescent Nevada Associates, LLC ("Crescent") and Prime Associates Group, LLC ("Prime") each own minority equity interests in Alliance Network of about 20% and 10%, respectively. Alliance Network is governed by the Manager–Managed Operating Agreement of Alliance Network, LLC (the "Alliance Network Agreement").

Before Venture was created in 2004, Alliance Network owned and operated WMC. When Venture took over, however, Alliance Network's participation in, and profit share from, future phases of WMC was reduced to approximately 50%. At the same time, NAMA and Crescent, the two original members of Alliance Network, had their collective profit share in that entity reduced by half. The newcomer, Prime, became entitled to the other half of Alliance Network's profits due to its 10% equity stake in Alliance Network and its obligation to facilitate the entity's management.[4]

## 2. *The Relationship Deteriorates*

In October 2006, Related issued a proposed funding notice for Phase Three of WMC. Shortly thereafter, the Alliance Network manager sent a capital call notice to the Alliance Network members. The capital call notice required a $41.5 million investment from NAMA and Crescent if they wished to fully participate in Phase Three.[5]

NAMA immediately objected. Specifically, NAMA believes that the Alliance Network manager plans to use a substantial amount of the capital call proceeds to collateralize the Phase Three construction loan, unnecessarily increase the size of the loan, and then pay itself bloated management fees from the excess loan proceeds. NAMA simultaneously accuses the Alliance Network manager of wrongfully withholding from the Alliance Network members $19 million of proceeds from a Phase One refinancing. NAMA maintains that these funds were improperly withheld so as to coerce NAMA into funding the excessive capital call for Phase Three.

Despite voicing these concerns, NAMA gave notice to the Alliance Network manager on October 25, 2006 that it would exercise its co-investment election. For the next month, NAMA demanded information from the Alliance Network manager relating to the Phase One funds and the Phase Three capital call. On November 20, 2006, NAMA tendered $41,560,480 to meet its election obligation in full, while simultaneously reserving all its rights, remedies, claims, and defenses.[6]

Two days after NAMA's tender, the Alliance Network manager advised the Alli-

---

4. Prime's ownership is primarily held, either directly or indirectly, by Shawn Samson and Jack Kashani. Samson and Kashani are jointly designated by the Alliance Network Agreement as the entity's manager.

5. NAMA and Crescent had a contractual right under the Alliance Network Agreement to elect either full participation (a "co-invest-

ment election") or partial participation (a "carried interest option") in a new phase of WMC at the beginning of that phase.

6. Unlike NAMA, Crescent did not elect to participate in Phase Three, and exercised neither its "co-investment option" nor its "carried interest option."

ance Network members of a $23,795,328 alteration to the original calculations provided in Related's October funding notice. Related then issued an additional proposed funding notice on December 6, 2006. In turn, the Alliance Network manager sent a second capital call notice requiring NAMA to contribute, by January 8, 2007, another $8,371,650 if it desired to maintain full participation in Phase Three.

On December 14, 2006, NAMA received (1) a notice from the Alliance Network manager that Crescent had purportedly assigned its interest in Phase Three and all future phases to an entity called Fordgate World Market Center LLC, (2) a notice from the Alliance Network manager that Prime and Fordgate intended to seek out capital from new investors to meet NAMA's purported shortfall in fulfilling its co-investment election for Phase Three, and (3) its uncashed checks totaling just over $41.5 million, which the Alliance Network manager had held since November 20.

### 3. NAMA Attempts To Enforce Its Contractual Rights

### a. NAMA's Right To Inspect Venture's Books And Records

At various points in time from October to December 2006, NAMA sought to enforce provisions specifically included for its benefit in the Venture Agreement. While not a signatory to that agreement, section 12.18(j) explicitly states that NAMA is a third-party beneficiary of section 12.18 in its entirety. Section 12.18(e) provides:

> The members of Alliance Network, each at its sole cost and expense, shall have reasonable access at reasonable times on business days upon prior written notice to the books and records of [Venture]

and any of the Project Companies in which Network has a direct, or indirect, interest, in the same manner, to the same extent, and otherwise upon the same terms and conditions as [Related and Network] are permitted to access such books and records. . . .

Thus, section 12.18(e) allows NAMA, as a member of Alliance Network, to access Venture's books and records upon prior written notice.

On November 3, 2006, NAMA gave notice of its decision to inspect the books and records of Venture, its subsidiaries, and its affiliates. A letter from Venture purportedly confirmed that NAMA could begin its inspection on November 13, 2006 if a confidentiality agreement was executed. NAMA refused on the basis that such an agreement was not a precondition to its rights under section 12.18(e), and that the proposed agreement's language was unduly broad and restrictive.[7]

On November 13, NAMA's representatives traveled to Venture's offices in Las Vegas. Venture then took the position that only NAMA's manager—Mousa Alliance, a resident of Israel—could inspect the books and records, not a duly-appointed NAMA representative. Venture also claimed that it would not allow even Mr. Alliance to make copies of any relevant documents. NAMA's representatives left Las Vegas without having gained access to Venture's books and records.

On December 7, 2006, the day after Related issued its proposed additional funding notice, NAMA renewed its inspection demand. NAMA included a list of certain categories of books and records which it believed it was entitled to review

---

7. The agreement allegedly went so far as to provide that neither NAMA nor its representatives could "directly or indirectly *use*, disclose, disseminate, publish, divulge, or otherwise reveal any Confidential Information *for any purpose at any time.*" (Emphasis added.)

and stated its inspection objectives.[8] Venture claimed that, based on a cursory, random sampling of financial statements Venture selectively delivered immediately following NAMA's trip to Las Vegas, NAMA was afforded "extensive access" to Venture's books and records during the week of November 13. Weeks later, after the second inspection date had come and gone, Venture offered to make a limited category of books and records available, but renewed its requirement that NAMA sign a confidentiality agreement with provisions limiting NAMA's use of any copies it made.

### b. *NAMA's Right To Demand Segregation Of Disputed Funds*

Unable to gain access to Venture's books and records, NAMA undertook to enforce another contractual right it enjoys under the Venture Agreement. Section 12.18(g) of that contract provides:

Upon receipt by Related of a written notice from any member of Alliance Network (a "Disputing Alliance Member") certifying to Related that there is a bona fide dispute between the Disputing Alliance Member and the other members and/or the managers of Alliance Network (the "Affected Alliance Members") or any of them regarding the parties' respective shares of, and/or the allocation, calculation, timing or distribution of Affiliate Fees, other fees, Cash Available for Distribution, net income or any other amount due Network (or any other Person who is part of the Alliance Network Group) under this Agreement and specifying the items that are in dispute (the "Disputed Items"), then notwithstanding

any provision in this Agreement to the contrary, Related shall retain from any future distributions or payments of the Disputed Items due Network (or any other Person who is part of the Alliance Network Group) on account of the Disputed Items with respect to any Phase of the Project or Ancillary Business in which Network has a direct, or indirect, Interest and shall instead, deposit such amounts (the "Disputed Amounts") in a segregated bank account of [Venture] until such time as either: (i) the parties to such Dispute direct and authorize Related, by joint written instructions, to release the Disputed Amounts; or (ii) Related receives a copy of the decision of the Person arbitrating such dispute under the provisions of Article IX of the Alliance Network Operating Agreement, subject in any case to the superior rights of Related and any Project Lender to such Disputed Amounts in accordance with [ ] this Agreement.

On December 15 and 19, 2006, NAMA provided written notice and certification to Related of certain Disputed Items existing between NAMA and the other members and managers of Alliance Network. NAMA also demanded that Related not distribute any of the Disputed Amounts, and that those funds be placed in segregated bank accounts. The Disputed Items listed in NAMA's letters included, *inter alia*, the $19 million in proceeds from the Phase One loan refinancing which the Alliance Network manager failed to distribute; the improper allocation and distribution of Affiliate Fees with respect to Phases One, Two, and Three; and, the improper demand by Venture, Prime, and the Alliance

---

8. NAMA's reason for making the demand was "to verify that the respective [WMC] entities and those who are managing them are conducting the business (including, but not limited to, with respect to the use of NAMA's funds) in an honest manner consistent with the applicable agreements and the fiduciary duties owed to NAMA and [WMC]" and "to provide NAMA with information critical to its participation in [WMC]."

Network manager for leasing fees with respect to Phase Three.

Related responded to NAMA's demands on December 27, 2006, stating that it had complied, and would continue to comply, with its obligations under section 12.18. Unsatisfied with such generality, NAMA again demanded a "simple, straightforward and unequivocal response as to each [category of Disputed Items], including confirmation of the segregated bank account into which each Disputed Amount has been deposited and the date of such deposit." Related refused to provide any specific confirmation.

### 4. *NAMA Files Suit Against Venture And Related*

NAMA filed both the Inspection Action and the Specific Performance Action in the Court of Chancery on February 27, 2007. In the Inspection Action, NAMA requests the court enter an order permitting either NAMA or its representatives to inspect and copy the books and records of Venture and Venture's affiliates as provided in section 12.18(e) of the Venture Agreement. In the Specific Performance Action, NAMA asks for an order requiring Related to perform its obligations under section 12.18(g) of the Venture Agreement by seg-

regating and holding the disputed funds in a separate bank account owned by Venture and by "specifically identifying to NAMA the date that the [funds] were deposited, the amount of such deposit, and the bank account(s) into which the [funds] were deposited."

▪ The defendants in both suits filed motions to dismiss the complaints or to stay the litigation. Related alternatively moving for summary judgment in the Specific Performance Action. Those motions were fully briefed, and the court held oral argument on March 28, 2007.[9]

### II.

The defendants' primary argument rests on the construction and operation of three contractual arbitration provisions which they contend function to deprive this court of subject matter jurisdiction over these disputes. The first—section 11.4(a)(v) of the Venture Agreement—provides that in the event any dispute arises out of that contract as to which arbitration is not already expressly mandated, Related and Network can jointly consent to have that dispute arbitrated.[10] According to the defendants, because Related and Network have agreed to do so, the court should

---

**9.** The court denies Related's motion for summary judgment for several reasons and need not address the motion at any length in Part III of this opinion. First, at the scheduling conference on March 9, 2007, the court stated that, due to the relatively expedited nature of this litigation, it would only hear motions to dismiss and specifically told the defendants it would not entertain a motion for summary judgment. Second, Related's motion is premature based on the record in the Specific Performance Action. Summary judgment is particularly improper when the party seeking it "essentially controls the relevant information material to the issue" the court is asked to decide. *Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1061 (Del.1986). This is certainly the case here. Moreover, NAMA has had no

opportunity to conduct discovery, a process to which NAMA is entitled in this contract dispute. *See Bren v. Capital Realty Group Senior Housing*, 2004 WL 370214, at *8 (Del.Ch. Feb.27, 2004) ("Prior to granting a motion for summary judgment, discovery, even if limited to the issues presented on the motion for summary judgment, must be permitted.").

**10.** Section 11.4(a)(v) provides: "Any dispute, claim or controversy (each, a "Dispute") arising out of this Agreement which ... [Related and Network] agree to submit to arbitration shall be determined and resolved by arbitration (and not by litigation) conducted in Las Vegas, Nevada or at such other location as [Related and Network] approve."

dismiss the two complaints since NAMA is now obligated to arbitrate the subject matter of both suits.

The second provision the defendants point to, specifically with regard to the Inspection Action, is section 11.4(a)(iv) of the Venture Agreement.[11] That section mandates that any dispute arising out of certain exhibits to the contract be submitted to arbitration. The defendants say that since NAMA's right to inspect books and records also purports to be based upon contractual sections contained in these exhibits as well as section 12.18(e), section 11.4(a)(iv) provides another basis upon which the court can dismiss the Inspection Action in favor of arbitration.[12]

The defendants rely on a third arbitration provision as well, but this one is found in the Alliance Network Agreement. Section 11.01 provides that if a dispute arises between any of the Alliance Network members or managers "with respect to" or "as to any other matter, cause or thing whatsoever relating to" the Alliance Network Agreement, the members must submit the dispute to arbitration.[13] The defendants repeatedly emphasize that NAMA's complaints attempt to mask the two core disagreements between it and the other members of Alliance Network—the propriety of the capital call and NAMA's rights and interests in Alliance Network—both of which they say are arbitrable. In the defendants' view, since the claims NAMA has submitted here cannot be resolved without reference to, or interpretation of, the Alliance Network Agreement, the court should dismiss both actions in favor of arbitration.[14]

---

**11.** Section 11.4(a)(iv) states: "Any dispute, claim or controversy (each, a "Dispute") arising out of this agreement which ... is a Dispute ... arising with respect to Exhibit 7 and/or Exhibit 8 attached hereto, ... shall be determined and resolved by arbitration (and not by litigation) conducted in Las Vegas, Nevada or at such other location as [Related and Network] approve."

**12.** Section 6.1 of Exhibit 7 to the Venture Agreement provides: "Development Member shall maintain books and records with respect to the construction of each Phase of the Project.... All books and records regarding each Phase ... shall at all times (during normal business hours) be available for inspection and copying by [Venture] and the applicable Phase Company, [Related and Network], applicable Construction Lenders, and any accountant, attorney, agent or representative of such party."

Section 5.1 of Exhibit 8 of the Venture Agreement states: "P & L Member shall maintain books and records with respect to the functions that it performs in connection with each Phase of the Project.... All books and records regarding each Phase ... shall at all times (during normal business hours) be available for inspection and copying by [Venture] and the applicable Phase Company, [Re-

lated and Network], the applicable Construction Lenders, and any accountant, attorney, agent or representative of any such party."

**13.** Section 11.01 provides: "Should any disagreement, dispute, conflict, claim or controversy arise between any of the [Alliance Network] members ... with respect to this agreement or any of the provisions thereof, or as to the interpretation or effect thereof, or as to a breach thereof claimed to have been committed by any member or members or manager, or as to any other matter, cause or thing whatsoever relating to this agreement, ... then the members agree that the same shall be submitted to and determined by arbitration."

**14.** Venture and Related also argue for the first time in their respective reply briefs that only "members" of Alliance Network are entitled to enforce sections 12.18(e) and (g) of the Venture Agreement, and a controversy exists as to whether or not NAMA is presently a bona fide member of Alliance Network. This purported dispute over membership, the defendants claim, definitely falls within the ambit of the arbitration provisions of the Alliance Network Agreement, and the court should dismiss NAMA's suits on that basis. The court need not address this argument at any length, for it is little but an eleventh-hour

In the alternative, the defendants urge the court to stay both the Inspection Action and the Specific Performance Action pending the outcome of arbitration. Since the issues in these cases, so the defendants say, are heavily intertwined with numerous factual issues that will appear in an arbitration proceeding between NAMA and the other members of Alliance Network, the court should stay these cases to prevent potentially conflicting rulings and the waste of judicial resources.

Turning their focus solely to the Specific Performance Action, the defendants make a barrage of arguments as to why dismissal is appropriate. First, the defendants say that because Related provided NAMA with the information it sought under section 12.18(g) by letter dated March 15, 2007, no justiciable controversy remains, and the case should be dismissed as moot. Next, the defendants urge the court to dismiss the Specific Performance Action because any claims which NAMA might ultimately prove in that suit are fully compensable by money damages.

In addition, the defendants contend that any judicial determination of the appropriate amounts subject to segregation under section 12.18(g) necessarily implicates the contractual rights of Network, the other signatory to the Venture Agreement, as well as the pecuniary interests of the other members of Alliance Network. Those parties, according to the defendants, cannot feasibly be joined, and, indeed, NAMA's complaint omits them to avoid application of the arbitration provisions found in the Alliance Network Agreement. Nevertheless, the defendants maintain that these entities are necessary and indispensable to

a just adjudication of this dispute under Court of Chancery Rule 19, and thus ask the court to dismiss the Specific Performance Action due to the absence of those parties.

Finally, Related and Venture each make a defendant-specific argument for dismissal. Venture says that the Specific Performance Action fails to state a claim against it because the allegations in NAMA's complaint are at best conclusory and should thus be swept aside pursuant to Court of Chancery Rule 12(b)(6). Related argues that to the extent NAMA's claims in the Specific Performance Action go beyond section 12.18 of the Venture Agreement, those claims fail under Rule 12(b)(6) because NAMA is a third-party beneficiary only to section 12.18. Thus, Related says, NAMA has no ability to properly assert claims arising under other provisions of that contract.

In response to the defendants' arbitration arguments, NAMA first contends that it is only a third-party beneficiary of section 12.18 of the Venture Agreement, not a party or signatory to the entire contract. Since that section contains no express arbitration language, NAMA says that it is not bound by the actual arbitration provisions found in section 11.4.

NAMA supports this argument in several ways. NAMA contends section 11.4(a)(v) does not require arbitration of any of its claims since that section merely recognizes Related and Network can agree, *ex post*, to arbitrate disputes *between themselves*. NAMA also says the defendants' arguments as to section

---

contrivance belied by the defendants' prior admissions contained in their briefing. *See, e.g.,* Venture's Opening Br. 9 ("Thus, NAMA is not a Member of [Venture], but only of Alliance Network."); Related's Opening Br. 2 ("NAMA is not a member of [Venture]. It is,

however, a member of an entity called Alliance Network LLC."). In any event, the defendants blatantly acknowledge that there is no dispute regarding NAMA's rightful status as a member of Phase One, which is itself sufficient to defeat this line of argument.

11.4(a)(iv) are unavailing, primarily because NAMA is basing its right to inspection solely on section 12.18(e).

Additionally, NAMA contends that section 11.01 of the Alliance Network Agreement does not compel arbitration. NAMA only seeks to litigate the narrow issues associated with its contractual rights to inspect Venture's books and records and to have Related hold and segregate disputed funds. Resolution of these issues, NAMA maintains, does not require a judicial determination as to whether the capital call was proper or whether NAMA is ultimately entitled to a particular fee payment or distribution under the terms of the Alliance Network Agreement.

NAMA then focuses on refuting the defendants' arguments directed solely at the Specific Performance Action. As to mootness, NAMA contends that Related's March 15 letter does not dissolve the controversy, as that letter fails to adequately address a number of "Disputed Items" that should be accruing from Venture's ongoing operations. Thus, NAMA believes it is entitled to a court order requiring Related to provide adequate documentation that such items are being retained and segregated. As to the adequacy of money damages, NAMA says that the defendants' own arguments betray the notion that an order of specific performance is inappropriate. Since section 12.18 of the Venture Agreement, according to the defendants, strictly limits Related's monetary liability for any failure to comply with section 12.18(g), NAMA argues that specific performance is necessary because it may not be able to obtain money damages from Related as a matter of right.

Furthermore, in NAMA's view, Alliance Network, its members and subsidiaries, and Network are not necessary parties to the Specific Performance Action simply because NAMA's claim is narrowly tailored and seeks only to have disputed monies temporarily set aside under section 12.18(g). These other parties' ultimate rights to the disputed amounts, NAMA says, need not be determined in the Specific Performance Action. Finally, NAMA claims that the Specific Performance Action should not be dismissed under Rule 12(b)(6) as to Venture because section 12.18(g) specifically requires Related to deposit the disputed funds in a bank account owned and controlled by Venture. Thus, Venture is a necessary nominal party to the Specific Performance Action.

## III.

### A. *Arbitration* [15]

█ Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate.[16] Because the strong public policy in favor of arbitration embodied in federal law is given equal respect in this State,[17] a motion to dismiss for lack of subject matter jurisdiction will be granted if the "dispute is one that, on its face, falls within the arbitration clause of the contract." [18]

---

**15.** A motion to dismiss based on an arbitration clause goes to the court's subject matter jurisdiction over the dispute and is properly reviewed under Court of Chancery Rule 12(b)(1). *Ishimaru v. Fung,* 2005 WL 2899680, at *13 (Del.Ch. Oct.26, 2005). As such, the court may consider documents outside the complaint for purposes of such a motion. *Acierno v. New Castle County,* 2006 WL 1668370, at *1 n. 8 (Del.Ch. June 8, 2006).

**16.** *Elf Atochem N. Am., Inc. v. Jaffari,* 727 A.2d 286, 295 (Del.1999).

**17.** *Anadarko Petroleum Corp. v. Panhandle E. Corp.,* 1987 WL 13520, at *8 (Del.Ch. July 7, 1987).

**18.** *SBC Interactive, Inc. v. Corporate Media Partners,* 714 A.2d 758, 761 (Del.1998).

▮ Generally, in determining if a given claim is subject to arbitration, a court must engage in a two-part inquiry, as delineated by the Delaware Supreme Court in *Parfi Holding AB v. Mirror Image Internet, Inc.*[19] *Parfi* instructs that:

First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to the right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.[20]

A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by the courts.[21] However, this presumption will not trump basic principles of contract interpretation,[22] for a litigant "cannot be required to submit to arbitration any dispute which [it] has not agreed to so submit." [23]

1. *The Effect Of Section 11.4(a)(v) Of The Venture Agreement*

As an initial matter, the controversy surrounding section 11.4(a)(v) of the Venture Agreement is abnormal. In a typical arbitration dispute, the parties argue whether or not the asserted cause of action directly or indirectly relates to contractual rights.[24] No such disagreement exits here. NAMA readily admits that the rights it seeks to assert are specifically enumerated contractual rights under section 12.18.

Moreover, the actual signatories to the contract are not involved in the dispute over the arbitration provision. Rather, it is a signatory (Related) and a non-signatory, third-party beneficiary (NAMA) that dispute the proper scope of section 11.4(a)(v). In these circumstances, instead of first analyzing the dispute's arbitrability under the *Parfi* framework, the court must examine a more fundamental question— namely, whether or not the arbitration provision of the Venture Agreement can be interpreted, consistent with basic principles of contract and equity, in such a way as to reasonably conclude that NAMA voluntarily consented to submit the present disputes to arbitration. The court cannot reach such a conclusion.

▮ A non-signatory to a contract cannot be bound by an arbitration clause unless "traditional principles of contract and agency law" equitably confer upon that party signatory status with regard to the underlying agreement.[25] These principles include a third-party beneficiary theory and an estoppel theory, both of which the

---

19. 817 A.2d 149 (Del.2002).

20. *Id.* at 155.

21. *Majkowski v. Am. Imaging Mgmt. Servs., LLC,* 913 A.2d 572, 581–82 (Del.Ch.2006); *Westendorf v. Gateway 2000, Inc.,* 2000 WL 307369, at *3 (Del.Ch. Mar. 16, 2000).

22. *Parfi,* 817 A.2d at 156.

23. *James & Jackson, LLC v. Willie Gary, LLC,* 906 A.2d 76, 78 (Del.2006).

24. *See, e.g., Parfi,* 817 A.2d at 156–57 (holding that certain fiduciary duty claims did not arise out of the underlying contractual provisions); *Majkowski,* 913 A.2d at 584–85 (holding that advancement rights arose from separate agreements which did not contain arbitration provisions).

25. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 194 (3d Cir.2001).

defendants contend should operate in this case to bind NAMA to arbitration.[26]

■■■ A third-party beneficiary's rights are measured by the terms of the contract. When the beneficiary accepts the benefits of a contract, it also must accept the burdens expressed in that document.[27] Indeed, a court will not allow a third-party beneficiary to cherry-pick certain provisions of a contract which it finds advantageous in making its claim, while simultaneously discarding corresponding contractual obligations which it finds distasteful.[28] As one leading commentator states, "where [a] contract contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary is bound thereby to the same extent that [one of the signatories] is bound."[29]

■■■ The law is clear that, in the context of enforcing an arbitration clause, a third-party beneficiary of the agreement has no greater rights to compel or avoid arbitration than does one of the signatories to the contract. Therefore, the reading the defendants give to section 11.4(a)(v)—

that Related and Network can mutually agree to bind an Alliance Network member to arbitration—is unreasonable.[30] Instead, NAMA's interpretation—that section 11.4(a)(v) simply allows Related and Network to agree to arbitrate disputes between themselves alone—stands as the only rational one.

Suppose that instead of section 12.18 conferring certain rights upon NAMA, it conferred rights upon either Related or Network. Under section 11.4(a)(v), neither Related nor Network could compel arbitration of such a dispute without the other party's consent. It is inequitable and illogical, at least absent explicit contractual language to the contrary, to hold that an arbitration clause operates more broadly upon a third-party beneficiary of a contract than upon one of the signatories. Such a ruling would flout basic principles of third-party beneficiary law, which teach that the beneficiary stands in the shoes of one of the signatories of the contract for purposes of enforcing or being bound by the contract's terms.[31]

---

26. See, e.g., id. at 195–98 (discussing a third-party beneficiary theory); *Ishimaru*, 2005 WL 2899680, at *17–18 (discussing an equitable estoppel theory); *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (noting that several theories exist for binding non-signatories to arbitration agreements, including incorporation by reference, assumption, agency, veil-piercing, and estoppel).

27. See, e.g., *E.I. DuPont*, 269 F.3d at 195 (stating that "a third-party beneficiary [is] bound by contract terms where its claim arises out of the underlying contract to which it [is] an intended third-party beneficiary"); RESTATEMENT (SECOND) OF CONTRACTS § 309 cmt. b (1981) (stating that "the right of a beneficiary is subject to any limitation imposed by the terms of the contract").

28. *Rumsey Elec. Co. v. Univ. of Del.*, 358 A.2d 712, 714 (Del.1976).

29. 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 37.24 at 154 (4th ed. 1992).

30. The case law does instruct that doubts should be resolved in favor of arbitrability when a "reasonable interpretation in that direction exists." *Ishimaru*, 2005 WL 2899680, at *13 (citing *SBC Interactive*, 714 A.2d at 761). However, the court is not required to grasp at straws and interpret an arbitration provision in an unreasonable manner just to blindly vindicate the broad public policy that supports arbitrating disputes.

31. The court also notes that while Related maintains in its briefing that it and Network have agreed to arbitrate the subject matter of the Specific Performance Action and the Inspection Action, there is no actual evidence in the record, by affidavit of Related or otherwise, of the existence of such an agreement.

Moreover, other rights conferred upon NAMA by section 12.18, when viewed in light of the overall structure of the arbitration provisions found in the Venture Agreement, also lead to the conclusion that the defendants' interpretation of section 11.4(a)(v) is untenable. NAMA, as the majority member of the former sole owner of WMC, undoubtedly wished to protect its ability to obtain financial information about WMC and to prevent distributions of funds to Alliance Network while conflicts between the Alliance Network members were being resolved. To protect its rights, NAMA presumably insisted upon inclusion of section 12.18(i), which provides:

> Notwithstanding anything to the contrary set forth in this Agreement, this section 12.18 may not be amended, revised, augmented, supplemented, modified, superceded, deleted or otherwise changed without the prior written consent of NAMA in each instance.

Furthermore, despite the defendants' implicit arguments to the contrary, the arbitration provision in the Venture Agreement is really quite narrow. The default operation of section 11.4(a) dictates that disputes arising out of the agreement are only arbitrable if "expressly required by the terms of the Agreement."[32] Indeed, several sections of the Venture Agreement contain an express provision stating that disputes arising out of that specific section of the contract must be arbitrated, while the vast majority of the sections do not.[33] Thus, it is reasonable to infer what the parties intended: if a specific section of the contract expressly requires arbitration, the parties must arbitrate that type of dispute; if not specified, arbitration occurs only with the consent of those entities whose rights and obligations are at issue.

This type of narrow, piecemeal approach to arbitration is significant here for one simple reason—unlike some other provisions of the contract, section 12.18 does not include any language concerning arbitration. When viewed in conjunction with NAMA's unilateral right to prohibit alterations or modifications to section 12.18, the court is convinced that the Venture Agreement cannot be construed to allow for arbitration of disputes arising under section 12.18 in the absence of NAMA's consent.

■ Having determined that NAMA does not come within the ambit of section 11.4(a)(v) due to its status as a third-party beneficiary of section 12.18, the court still must decide whether NAMA is estopped from asserting that the disputes at issue are not arbitrable. For this estoppel theory to apply, NAMA must have derived direct, rather than indirect, benefit from the Venture Agreement during the course of the agreement's performance.[34]

Due to the structure of NAMA's ownership interest in Venture, any benefit (pecuniary or otherwise) NAMA received under the Venture Agreement was strictly indirect and only accrued because NAMA is a member of Alliance Network (which, in turn, owns Network). Other courts have held that such indirect benefit under a contract is an insufficient basis on which to

---

**32.** Section 11.4(a)(i), Brown Aff. Ex. C at 92.

**33.** *See, e.g.,* section 5.6(a)(iii), Brown Aff. Ex. C at 60 ("Any Disputes arising under this Section 5.6(a)(iii) shall be determined by arbitration in accordance with Section 11.4."); section 5.6(a)(iv), Brown Aff. Ex. C at 60 ("All Disputes arising under this Section 5.6(a)(iv) shall be resolved by arbitration in accordance with Section 11.4 of this Agreement."); section 5.13(d), Brown Aff. Ex. C at 66 ("Any Disputes arising out of this Section 5.13 shall be determined by arbitration in accordance with Section 11.4.").

**34.** *Thomson–CSF,* 64 F.3d at 778–79.

invoke an equitable estoppel theory to bind a non-signatory to an arbitration clause of a contract, and the court sees no reason to deviate from those decisions.[35] Moreover, it is difficult to conceive how NAMA has directly benefited from section 12.18. NAMA filed suit to enforce the benefits it is owed under section 12.18, benefits which NAMA alleges Related's conduct has wholly foreclosed.

For the aforementioned reasons, the defendants cannot, either under equitable estoppel or because of NAMA's third-party beneficiary status, compel NAMA to arbitrate either the Specific Performance Action or the Inspection Action pursuant to section 11.4(a)(v) of the Venture Agreement.

### 2. The Effect Of Section 11.4(a)(iv) Of The Venture Agreement

For several reasons, the Inspection Action does not fall within the arbitration mandate of section 11.4(a)(iv) of the Venture Agreement. The arbitrability of a particular claim is determined by examining whether or not that claim is "one that, on its face, falls within the arbitration clause of the contract."[36] On its face, the claim for relief in the Inspection Action is based on section 12.18(e) of the Venture Agreement, not Exhibits 7 or 8 thereto. If Exhibits 7 and 8 never existed, NAMA would still have a right to inspect books and records in accordance with section 12.18(e). That is all the court understands NAMA to be asserting, and it is entitled to bring a claim under that section without being compelled to arbitrate.

In addition, even if the Inspection Action were somehow based on Exhibits 7 or 8, NAMA would not be in a position to assert those claims. As the defendants themselves argue, NAMA, as a third-party beneficiary of section 12.18, only has standing to bring claims based on rights found in that section of the contract. The Inspection Action, then, cannot turn on Exhibits 7 or 8. Therefore, because the condition required for section 11.4(a)(iv) to operate—a dispute "arising with respect to" Exhibits 7 or 8—is not present in the Inspection Action, that claim cannot be subject to arbitration.

### 3. The Effect Of Section 11.01 Of The Alliance Network Agreement

The defendants' argument that section 11.01 of the Alliance Network Agreement requires arbitration of

---

35. *Id.*; *E.I. DuPont*, 269 F.3d at 200. In addition to the direct benefit theory of estoppel, courts have also recognized an alternative estoppel theory requiring arbitration between a signatory and a non-signatory. Under the alternative theory, a signatory may be bound to arbitrate at a non-signatory's insistence when the signatory's claims are "intimately founded in and intertwined with" the underlying contractual obligations to which an arbitration provision applies. *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993). As this court has observed, judges have been much more willing to estop a signatory from avoiding arbitration with a non-signatory, rather than vice versa. *Ishimaru*, 2005 WL 2899680, at *18 n. 50 (citing *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir.

2005)). Thus, it is important to proceed with a good deal of caution even when, as here, the court must analyze a claim under the direct benefit theory (rather than the alternative theory), lest nuanced concepts of equity be allowed to override established legal principles of contract formation. *See Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 531 (5th Cir.2000) (Dennis, J., dissenting) ("[N]early anything can be called estoppel. When a lawyer or judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel.") (quoting 4 WILLISTON ON CONTRACTS § 8.5 at 73).

36. *Ishimaru*, 2005 WL 2899680, at *13 (citing *SBC Interactive*, 714 A.2d at 761).

NAMA's claims must fail because it misapprehends the nature of what the court is being asked to decide in these cases. Indeed, the issues the court must decide here are not to any degree intertwined with disputes under the Alliance Network Agreement so as to render them related to those disputes for purposes of section 11.01.

In the Inspection Action, the lone issue is whether NAMA is entitled to inspect Venture's books and records on "the same terms and conditions as [Network and Related] are permitted access to such books and records." In the Specific Performance Action, the only issues requiring resolution are whether Related has retained (and will continue to retain) the required funds since NAMA's initial invocation of section 12.18(g) and whether Related's interpretation of its obligations under that section are consistent with the contractual provisions. None of these issues are dependent upon the actual propriety of Alliance Network's capital call. Furthermore, the court will not decide NAMA's or any other entity's rights to particular distributions under the Alliance Network Agreement, and will not opine as to whether NAMA's purported right of first refusal was improperly abridged by the Alliance Network manager. Therefore, section 11.01 of the Alliance Network Agreement cannot bind NAMA to arbitration under the false premise that the issues for decision in the Inspection Action and the Specific Performance Action relate to or concern disputes between the Alliance Network members.

■ Additionally, neither of the defendants have standing to enforce provisions of the Alliance Network Agreement, and NAMA is not bound to arbitrate its claims based on equitable estoppel as it might theoretically pertain to that agreement. As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions.[37] Mere incidental beneficiaries have no legally enforceable rights under a contract.[38] A third-party beneficiary is an incidental beneficiary unless the parties to the contract intended to confer a benefit upon it.[39] Without question, NAMA and the other signatories of the Alliance Network Agreement did not intend to confer benefit upon anyone but themselves under section 11.01. Indeed, neither Venture nor Related had even entered the picture when that agreement was originally executed in August 2001.

Nor can the defendants succeed on their argument that section 11.01 requires NAMA to arbitrate the claims at issue on an estoppel theory. Related and Network have received no direct benefit from the performance of the Alliance Network Agreement.[40] Furthermore, the claims in the Specific Performance Action and the Inspection Action are not "intimately founded in" the Alliance Network Agreement.[41] As discussed at length in the pre-

**37.** *Comrie v. Enterasys Networks, Inc.,* 2004 WL 293337, at *2 (Del.Ch. Feb. 17, 2004).

**38.** *Id.*

**39.** *See Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268, at *5 (Del.Ch. Apr. 17, 2001) ("To qualify as a third-party beneficiary of a contract, (i) the contracting parties must have intended that the third-party beneficiary benefit from the contract. . . .").

**40.** *See Thomson–CSF,* 64 F.3d at 778–79 (discussing the direct benefit element which is required for a non-signatory to be bound by an arbitration clause).

**41.** *See id.* at 779 (discussing the requirements of an alternative theory of equitable estoppel whereby a signatory to a contract with an arbitration clause may be required to arbitrate at a non-signatory's insistence).

ceding paragraphs, quite the opposite is true. For these reasons, section 11.01 of the Alliance Network Agreement does not require NAMA to arbitrate the claims it has brought before the court.[42]

### B. *Mootness* [43]

 The doctrine of mootness requires a court to dismiss a claim "if the substance of the dispute disappears due to the occurrence of certain events following the filing of an action." [44] If a grant of relief "cannot have any practical effect on the existing controversy," the dispute is moot.[45] However, if the alleged injury still exists despite the occurrence of intervening events, a justiciable controversy remains, and the mootness doctrine will not operate to deprive a court of jurisdiction to hear the case.[46]

 Related's contention that NAMA has received all of the relief it requested in the Specific Performance Action through Related's March 15, 2007 letter is, at least at this stage of the litigation, flawed and premature.[47] For example, in its complaint, NAMA asks the court to order Related to "specifically identif[y] . . . the date the Disputed Amounts were deposited [and] the amount of such deposit." The March 15 letter provides scant detail regarding the itemized breakdown of exactly what type of distributions are being segregated. NAMA's continuing demand for further detail of these amounts is a live

**42.** In light of the court's conclusion that the relevant provisions of the Venture Agreement and the Alliance Network Agreement do not require arbitration of NAMA's claims, the defendants' alternative argument to stay these proceedings pending the outcome of arbitration requires only a brief discussion. Although a stay is mandatory under the Federal Arbitration Act (9 U.S.C. § 3) and favored under Delaware law (10 *Del. C.* § 5701), the party seeking the stay must still show that the suit contains or concerns an issue that should be referred to arbitration. *See, e.g., Steinberg & Lyman v. Takacs*, 774 F.Supp. 885, 888 (S.D.N.Y.1991) (staying an action where some of the claims asserted involved arbitrable issues); *Johnson v. Foulk Road Med. Ctr. P'ship.*, 2001 WL 1563693, at *5 (Del.Ch. Nov. 21, 2001) (staying an entire litigation where some, but not all, of the agreements upon which the plaintiff based its claim contained binding arbitration provisions). As set forth in Part III(A), the defendants have not made such a showing. Therefore, like their motions to dismiss, the defendants' motions to stay these cases must fail.

**43.** Because the requirement of an actual controversy goes directly to the court's subject matter jurisdiction over an action, a motion to dismiss based on justiciability grounds is properly viewed in the context of Court of Chancery Rule 12(b)(1), and the court may consider documents and materials extrinsic to the complaint. *See, e.g., DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (discussing a federal court's lack of subject matter jurisdiction over a moot claim); *Stillman v. C.I.A.*, 2007 WL 1020814, at *3 (D.D.C. Mar. 30, 2007) (dismissing a claim for mootness based on lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)).

**44.** *Multi–Fineline Electronix, Inc. v. WBL Corp. Ltd.*, 2007 WL 431050, at *8 (Del.Ch. Feb. 2, 2007).

**45.** *The Library, Inc. v. AFG Enters., Inc.*, 1998 WL 474159, at *2 (Del.Ch. July 27, 1998).

**46.** *Energy Partners, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del.Ch. Oct. 11, 2006).

**47.** The court notes, however, that NAMA's right to have amounts segregated under section 12.18(g) is dependent upon an actual dispute between the Alliance Network members regarding the allocation of fees, distributions, and other inflows of cash. NAMA's rights under that section do not attach if, say, the only true dispute between the Alliance Network members concerns the propriety of the capital calls and has nothing to do with fees or distributions. Discovery should reveal whether or not this is the case.

controversy that prevents the Specific Performance Action from being moot.

NAMA is also entitled to investigate whether Related made any distributions between the date NAMA first sent notice that it was exercising its rights under section 12.18(g) (December 15, 2006) and the date the funds were ultimately segregated (December 22, 2006). Because section 12.18(g), by its terms, requires Related to retain and segregate only "future distributions and payments," this week-long period may be of crucial importance to NAMA and clearly meets the actual controversy requirement for this claim to survive a mootness challenge. For these reasons, the Specific Performance Action is not moot, and the defendants' effort to dismiss the suit on that ground must fail.

## C. *Failure To Join Necessary And Indispensable Parties*

Court of Chancery Rule 19(a) "categorizes those persons whose joinder should be required to accord complete adjudication of claims at issue." [48] It is "necessary" for a party to be joined when:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede that person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. [49]

The Delaware Supreme Court has noted that a necessary party must "not only have an interest in some part of the controversy but the interest must be such that a final decree cannot be made which will neither touch upon that party's interest nor leave the controversy in such a state that the final determination would be inconsistent with equity and good conscience." [50]

■■■■■ The defendants here argue that Network, Alliance Network, and its members are necessary parties to the Specific Performance Action because if the court were to grant the relief requested, the effect would be to deprive these entities of funds they are due from Venture (at least until the arbitrators finally resolve the capital call, right of first refusal, and fee disputes). But merely because a non-joined party may have a claim to a disputed amount does not inevitably deprive a court of the ability to render complete relief to the parties before it. [51] The Specific Performance Action concerns one party with a contractual right (NAMA) and one party with a contractual obligation (Related). If NAMA can prove its claim, Related will be obligated to retain and segregate funds as required under section 12.18(g). No other parties are needed to accord this relief.

Furthermore, the litigation of the Specific Performance Action will not impair Network's, Alliance Network's, or the other Alliance Network members' ability to adequately protect their ultimate rights to the segregated funds. In fact, these parties filed a demand for arbitration in Los Angeles, California on March 26, 2007 wherein they seek a determination that they have not breached any contractual

---

48. *Hughes Tool Co. v. Fawcett Publ's, Inc.*, 350 A.2d 341, 344 (Del.1975).

49. Ct. Ch. R. 19(a).

50. *Joseph v. Shell Oil Co.*, 498 A.2d 1117, 1125 (Del. Ch.1985) (citing *Elster v. American Airlines*, 106 A.2d 202, 203–04 (Del.Ch.1954)).

51. *Actrade Fin. Tech. Ltd. v. Aharoni*, 2003 WL 22389891, at *7 (Del.Ch. Oct. 17, 2003).

obligations to NAMA under the Alliance Network Agreement. Once Related receives a copy of the decision of the arbitrator, section 12.18(g)(ii) of the Venture Agreement directs Related to release and distribute the funds in accordance with the arbitrator's ruling. For this same reason, Related will not face inconsistent obligations with respect to the segregated funds since the arbitrator, not this court, has the ultimate say as to any final distribution of those funds. Therefore, the defendants' effort to dismiss this action for failure to join necessary parties miscarries.[52]

### D. *Failure To State A Claim Upon Which Relief Can Be Granted*

■■■■ Court of Chancery Rule 12(b)(6) requires dismissal of a claim only if "it can be determined with reasonable certainty that the plaintiff could not prevail on any set of facts reasonably inferable" from the pleadings.[53] A reviewing court assumes the truth of well pleaded allegations in the complaint, but mere conclusions are not given credence unless supported by specific allegations of fact.[54] "What this effectively means is that the court must consider the various factual permutations reasonably possible within the framework of the plaintiff's allegations and conclude whether any one conceivable set of facts could possibly merit granting [the] plaintiff relief. If so, the claim cannot be dismissed."[55]

■■■ Venture correctly asserts that NAMA's complaint in the Specific Performance Action contains no factually supported allegations of any wrongdoing by Venture. However, Venture's participation as a party in this action is necessary to afford NAMA the relief it seeks. The complaint seeks an order "segregating the Disputed Amounts *in a separate bank account . . . of [Venture] . . .*" in accordance with section 12.18(g) of the Venture Agreement. Therefore, Venture, if in name only, must remain a part of the Specific Performance Action even though NAMA has levied no substantive allegations against it.

### E. *The Adequacy of Money Damages In The Specific Performance Action*

■■■ A remedy at law, i.e. money damages, will foreclose the equitable relief of specific performance when that remedy is "complete, practical and as efficient to the end of justice as the remedy in equity, and is obtainable as [a matter] of right."[56] Under this standard, the defendants' argument that monetary damages provide a sufficient remedy in the Specific Performance Action is untenable and is belied by provisions of the Venture Agreement.

First, money damages for Related's purported failure to comply with section 12.18(g) may not be available to NAMA as a matter of right. Section 12.18(h)(iv) of the Venture Agreement provides that "Related's duties pursuant to Section 12.18(g) are purely ministerial in nature and . . .

---

52. Since Network, Alliance Network, and the other Alliance Network members are not necessary parties under Rule 19(a), it is unnecessary for the court to consider the defendants' Rule 19(b) analysis as to indispensability. *Id.*

53. *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 256 (Del.Ch.2006) (citing *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)).

54. *Id.*

55. *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *4 (Del.Ch. Jan. 11, 2001).

56. *City of Rehoboth Beach v. Capasso*, 1986 WL 10500, at *3 (Del.Ch. Sept. 22, 1986) (citing *In re Wife, K.*, 297 A.2d 424, 426 (Del. Ch.1972)).

Related shall incur no liability whatsoever for any action taken or omitted [under that section] except for willful misconduct, gross negligence, or bad faith, so long as Related has acted in good faith." Thus, if NAMA proves Related has not complied with section 12.18(g), but the evidence nevertheless shows that its noncompliance occurred only negligently and in good faith, NAMA would be left without a legal remedy against Related.

Second, the court is persuaded that money damages, even if section 12.18(h)(iv) does not bar them, fail to provide a complete and efficient remedy to NAMA. A contractual covenant allowing a party to restrict distributions to others necessarily involves a bargained-for benefit that money cannot adequately compensate.[57] The leverage that type of covenant creates provides a "material commercial advantage" to the party that can invoke it, and for a court to hold that money damages are an appropriate substitute for specific enforcement in a dispute like this one "would essentially involve the judicial nullification of the leverage-conferring aspects of such a provision."[58] Section 12.18(g) of the Venture Agreement grants NAMA unique economic bargaining power against Alliance Network's members and manager, and the court cannot place a meaningful dollar value on that power. Equitable relief, then, is an appropriate remedy in the Specific Performance Action.

## IV.

For the foregoing reasons, the defendants' motions to dismiss or to stay the Specific Performance Action and the Inspection Action, as well as Related's motion for summary judgment in the Specific Performance Action, are DENIED in all respects. IT IS SO ORDERED.

57. *Boesky v. CX Partners, L.P.*, 1988 WL 42250, at *14–15 (Del.Ch. Apr. 28, 1988).

58. *Id.*