**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: May 24, 2017
Date Decided: June 13, 2017

Theodore A. Kittila, Esquire
Greenhill Law Group LLC
1000 North West Street, Suite 1200
Wilmington, DE 19801

Richard H. Cross, Esquire
David G. Holmes, Esquire
Cross & Simon LLC
1105 North Market Street, Suite 901
Wilmington, DE 19899

RE: ***Yasser Draini v. Naseeb Networks, Inc., et al.***,
C.A. No. 12774-VCMR

Dear Counsel:

This letter opinion resolves Defendants' motion to dismiss this case in favor of arbitration and for lack of personal jurisdiction over Defendants Namma International Marine Services Co. Ltd., a Saudi Arabia company ("Namma"), Nesma Advanced Technology, a Saudi Arabia company ("Nesma"), and Nesma Holding Co., a Saudi Arabia company that wholly owns Namma and Nesma ("Nesma Holding").

## I. BACKGROUND

Plaintiff Yasser Draini seeks stock certificates for—or the fair value of—(1) certain shares of stock in Naseeb Networks, Inc., a Delaware corporation,

("Naseeb") and (2) stock options to purchase Naseeb stock to which he allegedly is entitled. Draini became the CEO of Gulf Tradanet W.L.L., a Bahrain company, ("Gulf") in late 2012. At that time, Gulf had three stockholders: Namma, Al Safat Energy Holding Company KSC, a Kuwait company ("Al Safat"), and Advanced Solutions, a Saudi Arabia company.

### A. The Al Safat Block of Naseeb Shares

In April 2012, Defendant Naseeb presented the Gulf stockholders with a letter of intent, which contemplated Naseeb's purchase of all Gulf shares in exchange for Naseeb stock. Namma and Advanced Solutions signed the letter of intent, but Al Safat was reluctant to sell its shares of Gulf in exchange for Naseeb stock. Rather, Al Safat wanted to be "bought out," presumably for cash. After several months, Namma, Advanced Solutions, and Naseeb executed a stock purchase agreement, dated November 11, 2012. Al Safat continued to refuse to sell its Gulf shares. Draini and Ahmed Reda, the head of Advanced Solutions, allegedly agreed to purchase the Naseeb stock that Al Safat would have received in the stock purchase from Al Safat. To accomplish that goal, Draini, Reda, Al Safat, and Namma agreed to a multi-party transaction under which Namma absorbed a loss that otherwise would have fallen to Al Safat, and Draini and Reda paid cash to Namma. As a result of the proposed transaction, Al Safat would cease to be a Gulf or Naseeb stockholder, and Draini and

Reda would receive Al Safat's shares of Naseeb. Reda agreed to purchase two-thirds of Al Safat's shares of Naseeb, and Draini agreed to purchase one-third of the shares—or 824,517 shares (190,267 of which were to be placed in escrow until certain benchmarks were met). Once the parties reached this agreement, Al Safat executed the November 11, 2012 stock purchase agreement on March 13, 2013. In April 2013, Draini paid 155,355 Saudi Riyal (approximately $41,428) to Namma for the Al Safat block of shares in Naseeb. But Draini never received certificates for the Naseeb shares.

### B. The Options to Purchase Naseeb Shares

In December 2012, even though Al Safat had not yet executed the stock purchase agreement, Naseeb began to exercise control over Gulf. Naseeb sought to retain Draini as CEO, and Draini allegedly entered a stock option agreement with Naseeb on December 25, 2012. Draini also entered a revised employment agreement with Gulf, dated January 1, 2013 (the "Employment Agreement"). The Employment Agreement provided in part that "[Draini] will be entitled to stock options entitling him to purchase stock of the Company's parent entity, Naseeb Networks Inc. in accordance with the terms and conditions of a stock option agreement to be entered

into between [Draini] and Naseeb Networks, Inc."[1]  Draini never received the stock options to which he was allegedly entitled under the Employment Agreement.

### C.    The Exit Agreement

In late 2013, Draini resigned from his employment due to disagreements with Naseeb's CEO Monis Rahman.  On December 26, 2013, Gulf and Draini entered a Resignation and Release of Claims Agreement (the "Exit Agreement").  Under the Exit Agreement, Draini resigned effective December 31, 2013, and he was entitled to receive $58,090 in severance pay.  The Exit Agreement also states that Naseeb agrees to transfer to Draini the 634,250 non-escrowed Naseeb shares that Draini purchased from Al Safat "after completion of the share transfer formalities by the Company."[2]  And the Exit Agreement states that Draini "shall be granted 158,561 stock options as per terms of the stock option agreement ('SOA') dated 25 December 2012."[3]

The Exit Agreement contains certain employment-related clauses.  In Section 5, Draini promises to return all company property to Gulf and warrants that he has

---

[1]    Compl. ¶ 23.

[2]    Exit Agreement § 2.1.

[3]    *Id.*

not retained any company property.  In Section 6.1, the Exit Agreement incorporates by reference the non-competition, non-solicitation, and confidentiality clauses from the Employment Agreement, and Draini acknowledges that those clauses remain in effect.  And in Section 6.2, the Exit Agreement contains a non-disparagement clause.

The Exit Agreement provides that "[t]his Agreement and Release contains the entire agreement between the parties and supersedes and terminates any and all previous agreements between them."[4]  It also contains an arbitration clause as follows:

> You acknowledge and affirm that, in view of the nature of the business in which the Company is engaged, the restrictions and agreements contained in your Employment Agreement and carried over to this Agreement and Release are reasonable and necessary in order to protect the Company's legitimate interests, and any breach or threatened breach thereof will lead to the Company being entitled to obtain from any court of competent jurisdiction temporary, preliminary and permanent injunctive relief or any other equitable remedy, as well as damages, which rights shall be cumulative and in addition to any other rights or remedies to which it may be entitled.
>
> Any claim or controversy arising out of or relating to this Agreement and Release shall be settled via arbitration by a sole arbitrator in accordance with the UNCITRAL Arbitration Rules as at present in force.  The place of

---

[4]      *Id.* § 11.

arbitration shall be Manama, Bahrain and the language of the arbitration proceedings shall be English.[5]

After entering the Exit Agreement, an unrelated dispute arose between Draini and Rahman. Thereafter, Gulf refused to honor the severance payments, and Draini filed litigation in Bahrain seeking to enforce the Exit Agreement.

In early 2014, Draini enlisted the assistance of Ousama Najjar, Namma and Nesma's principal representative, to attempt to obtain the stock certificates Draini allegedly had purchased from Al Safat or their fair value. But instead of receiving the stock certificates or their fair value, in September 2014, Draini allegedly was wired 155,535 Saudi Riyal, the price he paid for the Naseeb stock 17 months earlier. In the same month, Naseeb closed a $6 million financing round that the complaint alleges was based on a valuation for Naseeb of at least $25 million. Draini now seeks certificates for 824,517 Naseeb shares and 158,561 options for Naseeb shares—or the fair value of such shares.

## II.   ANALYSIS

Defendants move to dismiss under Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction because of the arbitration clause in Draini's Exit Agreement. "Delaware courts lack subject matter jurisdiction to resolve disputes

---

[5]     *Id.* §§ 9.1, 9.2.

that litigants have contractually agreed to arbitrate."[6] Delaware public policy favors arbitration, and "in recognition that 'contractual arbitration clauses are generally interpreted broadly in furtherance of that policy[,]' a Rule 12(b)(1) motion will be granted if the parties contracted to arbitrate the claims asserted . . . ."[7]

In this case, the Court must first decide whether the Court or the arbitrator is empowered to decide whether this claim should be arbitrated. Plaintiffs argue that because the Exit Agreement is "governed by and interpreted in accordance with the laws of the Kingdom of Saudi Arabia without regard to conflicts of law principles," Saudi Arabian law should govern the question of who decides substantive arbitrability. But Plaintiff cites no Saudi Arabian law and does not argue that Saudi Arabian law conflicts with Delaware law on this point. Absent any argument that a conflict of laws exists, I apply Delaware law.

"Under Delaware law, the interpretation of a contract is ordinarily a matter of law, which turns on the meaning that emerges from the contract's words. Contracts are to be interpreted as written, and effect must be given to their clear and

---

[6]     *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007).

[7]     *Li v. Standard Fiber, LLC*, 2013 WL 1286202, at *4 (Del. Ch. Mar. 28, 2013) (quoting *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581-82 (Del. Ch. 2006)).

unambiguous terms."[8]  Generally, if a contract is ambiguous, "the court should look to parol evidence and, in the end, give the contract the most reasonable interpretation that best reflects the parties' apparent intent."[9]  But "[i]n the case of contracts containing arbitration clauses . . . the policy in favor of arbitration requires that doubts regarding whether a claim should be arbitrated, rather than litigated, be resolved in favor of arbitration."[10]

Under the U.S. Supreme Court's opinion in *First Options of Chicago, Inc. v. Kaplan*,[11] which this Court followed in *Willie Gary LLC v. James & Jackson LLC*,[12] "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."[13]  The arbitration clause in the Exit Agreement is similar to the arbitration clause in *Willie Gary* in that

---

[8]  *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *5 (Del. Ch. Jan. 10, 2006).

[9]  *Id.*

[10]  *Id.*

[11]  514 U.S. 938 (1995).

[12]  2006 WL 75309, at *6 (Del. Ch. Jan. 10, 2006).

[13]  *First Options of Chicago*, 514 U.S. at 944.

it carves out equitable remedies, which may be obtained in a court.[14]  Section 9.1 of the Exit Agreement states in part that:

> [A]ny breach or threatened breach thereof will lead to the Company being entitled to obtain from any court of competent jurisdiction temporary, preliminary and permanent injunctive relief or any other equitable remedy, as well as damages, which rights shall be cumulative and in addition to any other rights or remedies to which it may be entitled.[15]

The *Willie Gary* court held that such an arbitration clause does not constitute clear and unmistakable evidence of the parties' intent to submit the question of substantive arbitrability to the arbitrator because the arbitration clause does not generally refer all disputes to arbitration.[16]  Instead, certain disputes may be brought in a court. Here, the result is the same.  The Court must determine substantive arbitrability because the contract does not submit all claims to arbitration but rather has an exception for certain remedies.

Section 9.2 of the Exit Agreement contains a broad arbitration clause submitting "[a]ny claim or controversy arising out of or relating to this Agreement and Release" to arbitration.  Defendants argued at oral argument that the right to

---

[14]     *Willie Gary*, 2006 WL 75309, at *6.

[15]     Exit Agreement § 9.1.

[16]     *Willie Gary*, 2006 WL 75309, at *7.

seek an injunction in a court in Section 9.1 of the Exit Agreement refers only to the employment obligations from the Employment Agreement that are incorporated by reference into the Exit Agreement. The unambiguous plain meaning of Section 9.1 supports that argument. It states as follows:

> [T]he restrictions and agreements *contained in your Employment Agreement and carried over to this Agreement and Release* are reasonable and necessary in order to protect the Company's legitimate interests, and any breach or threatened breach *thereof* will lead to the Company being entitled to obtain from any court of competent jurisdiction temporary, preliminary and permanent injunctive relief or any other equitable remedy, as well as damages . . . .[17]

Thus, only claims for breaches of Draini's non-competition, non-solicitation, or confidentiality obligations are not submitted to arbitration. In this case, Draini seeks an injunction requiring Naseeb to issue stock certificates or the fair value of the Naseeb shares he allegedly owns. The Section 9.1 exclusion from the arbitration clause does not include that claim. As such, Section 9.2 of the Exit Agreement submits Draini's claims in this case to arbitration.

Draini argues that his claims do not "arise out of" and are not "related to" the Exit Agreement but, instead, stem from the separate stock purchase agreement with

---

[17] Exit Agreement § 9.1 (emphasis added).

Al Safat and the stock option agreement with Naseeb. I disagree. The Exit Agreement expressly includes the 634,250 non-escrowed Naseeb shares and the 158,561 Naseeb stock options as "payments and benefits" to which Draini is entitled.[18] And the Exit Agreement includes a broad release of any claims against Gulf in exchange for those "payments and benefits."[19] Further, the Exit Agreement explicitly "supersedes and terminates any and all previous agreements" between Draini, Gulf, and Naseeb.[20] I find that even if Draini's claim does not "arise out of" the Exit Agreement, it is at least "related to" the Exit Agreement for purposes of the arbitration clause because the Exit Agreement terminates the other agreements between Draini and his former employer. Draini's claims, therefore, are submitted to arbitration, and Defendants' Rule 12(b)(1) motion to dismiss is granted.[21]

---

[18]   *Id.* § 2.1.

[19]   *Id.* § 3.

[20]   *Id.* § 11. Defendants argued at oral argument that Naseeb should be deemed a party to the Exit Agreement because it acquired Gulf. Oral Arg. Tr. 52.

[21]   Plaintiff also raises concerns that Defendants would not agree to submit to arbitration in Bahrain. Naseeb concedes that it is bound by the Exit Agreement and must participate in arbitration. Oral Arg. Tr. 52. At oral argument, counsel for Rahman represented that he too agrees to submit to arbitration. Oral Arg. Tr. 53. The remaining defendants are likely barred by estoppel from raising that argument because they have joined this motion seeking dismissal in favor of arbitration.

## III.  CONCLUSION

For these reasons, Defendants' Rule 12(b)(1) motion to dismiss is granted,

and their Rule 12(b)(2) motion to dismiss is denied as moot.

**IT IS SO ORDERED.**

Sincerely,

*/s/ Tamika R. Montgomery-Reeves*

Tamika R. Montgomery-Reeves
Vice Chancellor

TMR/jp