## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, GRANITE STATE INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | : : : : : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | C.A. No. 9852-VCS |
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, T H AGRICULTURE & NUTRITION, L.L.C. and THE T H AGRICULTURE & NUTRITION L.L.C. ASBESTOS PERSONAL INJURY TRUST, | : : : : : : : | |
| Defendants. | : : | |

## MEMORANDUM OPINION

Date Submitted: October 2, 2017
Date Decided: January 11, 2018

Marc S. Casarino, Esquire of White and Williams LLP, Wilmington, Delaware and John S. Favate, Esquire of Hardin Kundla McKeon & Poletto, P.A., Springfield, New Jersey, Attorneys for Plaintiffs.

David J. Baldwin, Esquire, Jennifer C. Wasson, Esquire and Andrew H. Sauder, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Kenneth H. Frenchman, Esquire of McKool Smith, P.C., New York, New York, Attorneys for Defendants Philips Electronics North America Corporation and T H Agriculture & Nutrition L.L.C.

Daniel K. Hogan, Esquire and Garvan F. McDaniel, Esquire of Hogan♦McDaniel, Wilmington, Delaware and Sander L. Esserman, Esquire, Steven A. Felsenthal, Esquire and David A. Klinger, Esquire of Stutzman, Bromberg, Esserman & Plifka, Dallas, Texas, Attorneys for Defendant T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust.

**SLIGHTS, Vice Chancellor**

The parties in this case are bound together in a contractual relationship that involves the administration of an asbestos trust, The T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust (the "Trust"), created to fund settlement payments to victims of asbestos exposure. The Trust was initially funded by Defendants, Philips Electronics North America Corporation ("PENAC") and T H Agriculture & Nutrition, L.L.C. ("THAN"), pursuant to THAN's plan of reorganization under Chapter 11 of the Bankruptcy Code.[1]

As of THAN's Chapter 11 filing, THAN and its then-parent, PENAC, faced significant asbestos-related liability and were engaged in insurance coverage litigation with several of their insurers (Plaintiffs in this action).[2] While THAN's Chapter 11 case was pending, the AIG Insurers, PENAC and THAN entered into a settlement agreement to resolve the coverage litigation (the "Settlement Agreement").[3] The Bankruptcy Court approved the Settlement Agreement on

---

[1] 11 U.S.C. §§ 1101–1174 (2012). In this opinion, "THAN" refers to (1) THAN before, on and after the effective date of its plan of reorganization under Chapter 11 of the Bankruptcy Code, and (2) any successor(s) to the "reorganized" THAN.

[2] Plaintiff insurers are AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa. (collectively, "Plaintiffs" or the "AIG Insurers").

[3] The Settlement Agreement is attached as Exhibit B to Plaintiffs' "First Amended Complaint" (the "Amended Complaint"). Am. Compl., Ex. B (Apr. 20, 2017).

May 6, 2009, and confirmed THAN's "First Amended Prepackaged Plan of Reorganization" (the "Plan") soon thereafter.[4]

The Plan provides for the Trust's assumption of THAN'S pre-petition asbestos-related liabilities, and directs to the Trust (via injunction) all asbestos-related personal injury claims on which THAN might otherwise be liable.[5] To recover on an injury claim, the claimant (or his/her representative) must submit the claim to the Trust, which then determines the amount, if any, the claimant is entitled to receive. The AIG Insurers are required (per the Settlement Agreement) to make incremental reimbursement payments to PENAC based on the total amount paid by the Trust on asbestos-related cancer claims.[6]

The parties' current dispute centers on the scope of the AIG Insurers' right under the Settlement Agreement to conduct a yearly "audit [of] payments and distributions made by the Trust."[7] Specifically, the parties dispute "what an audit must include to satisfy [Plaintiffs' audit] right."[8] In an earlier decision, the Court

---

[4] Dkt. 31 (TAB 7.A (Plan)). The Plan was affirmed (as modified) by the United States District Court for the Southern District of New York on October 26, 2009, and became effective on November 30, 2009. Am. Compl. ¶ 16; *see* Plan §§ 1.69, 12.2.

[5] *See* Plan §§ 4.4, 11.5 (establishing an "Asbestos PI Channeling Injunction").

[6] Settlement Agreement § 2.1.

[7] Settlement Agreement § 2.3.

[8] *AIU Ins. Co. v. Philips Elecs. N. Am. Corp.*, 2015 WL 3526976, at *8 (Del. Ch. June 4, 2015) ("*AIU I*").

2

determined that the Settlement Agreement "provides [Plaintiffs] with a broad audit right," but expressly refrained from declaring the precise scope of that right.[9] Following that decision, the parties made some progress toward the completion of an audit as contemplated by the Settlement Agreement, and an initial audit (of sorts) occurred on June 21–24 and July 25, 2016. Plaintiffs contend that the audit was "incomplete" and, thus, did not satisfy their audit right under the Settlement Agreement.

Plaintiffs have filed a six-count Amended Complaint in which they assert several claims arising out of the Settlement Agreement and the Plan. Counts I–V of the Amended Complaint relate to Plaintiffs' audit right and Count VI relates to Plaintiffs' offset-related rights.[10] PENAC, THAN and the Trust have variously moved to dismiss each count of the Amended Complaint. Plaintiffs have cross-moved for summary judgment on Counts V and VI.

As explained below, with respect to Counts I–V, the dispositive issues raised by the parties' motions turns on the proper construction of the following clause in Section 2.3 of the Settlement Agreement: "[Plaintiffs] shall have the right to audit payments and distributions made by the Trust."[11] The parties have offered

---

[9] *Id.*

[10] *See* Am. Compl. ¶¶ 98–147.

[11] Settlement Agreement § 2.3.

3

competing reasonable constructions of that language, and the present procedural posture does not allow the Court to choose between those constructions. Because the clause is ambiguous, the Court will receive extrinsic evidence regarding the intended meaning of the term "audit" in Section 2.3 to aid in its construction of that provision. While the parties have attempted to address the scope of the audit through the negotiation of an audit protocol, that process, as evidenced by this litigation, has failed. A definitive construction of the Settlement Agreement as relates to audit rights is necessary to guide the parties as they continue to work through the processing of asbestos claims in the years to come.

Count VI, relating to a purported right to offset for miscalculated payments made by the Trust, must be dismissed because it fails to state a claim upon which relief can be granted. The Trust is not a party to the Settlement Agreement, and Plaintiffs have failed to identify any basis other than the Settlement Agreement upon which Plaintiffs may be entitled to offset their payment obligations to PENAC under that agreement. Moreover, Plaintiffs have failed to plead the existence of conditions precedent to any set-off right they may have.

# I.    FACTUAL BACKGROUND

The facts are drawn from the allegations in the Amended Complaint, documents integral to the Amended Complaint and those matters of which the Court may take judicial notice, including the admissions of the parties.[12]  The Court's June 4, 2015, decision in this matter provides a detailed discussion of the parties and their relationships.[13]  I will not repeat that detail here.  Instead, I will focus on the facts relevant to the parties' current dispute.

## A.    The Trust's Distribution Procedures

The process by which the Trust reviews and liquidates asbestos-related personal injury claims ("Asbestos PI Claims") is governed by the "Trust Distribution Procedures" (the "TDP").[14]  The TDP "establish a schedule of eight asbestos-related diseases ('Disease Levels'), seven of which have presumptive medical and exposure requirements . . . and specific liquidated values ('Scheduled Values') . . . ."[15]

---

[12] *Merritt v. United Parcel Serv.*, 956 A.2d 1196, 1201–02 (Del. 2008) ("Voluntary and knowing concessions of fact made by a party during judicial proceedings . . . are termed 'judicial admissions.'"  In general, judicial admissions are "conclusive and binding both upon the party against whom they operate, and upon the court."); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (On a motion to dismiss, the court may consider documents outside of the complaint when the document, or a portion thereof, is (1) "integral to a plaintiff's claim and incorporated into the complaint," or (2) "an adjudicative fact subject to judicial notice.") (internal quotation and citations omitted).

[13] *AIU I*, 2015 WL 3526976, at *1–5.

[14] Dkt. 31 (TAB 5.B: Trust's "First Amended Distribution Procedures").

[15] TDP § 2.1.

Under the TDP, Asbestos PI Claims are processed via "Expedited Review" or "Individual Review." "[C]laims that undergo Expedited Review and meet the presumptive [medical and exposure criteria] for the relevant Disease Level" are paid the Scheduled Value indicated for that Disease Level.[16] By contrast, for claims processed via Individual Review, the Trust calculates claim value "based on the historic liquidated values of other similarly-situated claims in the tort system for the same Disease Level."[17] In making these calculations, the Trust "takes into consideration all of the factors that affect the severity of damages and values within the tort system."[18] Generally, the liquidated value of a claim processed via Individual Review may not exceed the "Maximum Value" indicated for the relevant Disease Level—although it may exceed the Scheduled Value for that Disease Level.[19]

---

[16] TDP § 5.3(a)(1).

[17] TDP § 5.3(b)(2).

[18] *Id.* Such factors include (1) the extent to which the claim's characteristics differ from the presumptive medical and exposure criteria assigned to the relevant Disease Level; (2) the claimant's personal characteristics, occupational history and time of exposure; and (3) settlement and verdict histories in the claimant's jurisdiction for similar claims. TDP § 5.3(b)(2)(i)–(vi).

[19] TDP § 5.3(b)(1)(B). For example, the Maximum Value for Asbestos PI Claims involving mesothelioma (Disease Level VIII) is $900,000, whereas the Scheduled Value for such claims is $150,000. TDP § 5.3(b)(3).

## B.     Relevant Contractual Provisions

The Amended Complaint principally implicates Sections 2.3 and 2.4 of the Settlement Agreement.[20]  Section 2.3 provides, in full:

> [Plaintiffs] shall have the right to audit payments and distributions made by the Trust at their own expense, no more than once per year. Before conducting any audit, AIG shall agree to keep all information confidential and shall further agree not to utilize any information for anything other than to assess whether the Trust in fact made payments to the claimants as set forth in the quarterly reports.[21]

Section 2.4 of the Settlement Agreement provides that Plaintiffs may not dispute the Trust's payments and distributions to claimants, or dispute or offset their

---

[20] The Amended Complaint also cites Section 8 of the Settlement Agreement and Section 10.4 of the Plan.  *See* Am. Compl. ¶¶ 100, 109, 119.  Per Section 8 of the Settlement Agreement, Plaintiffs, PENAC and THAN "shall cooperate to preserve the validity, finality, and enforceability of [the] Settlement Agreement."  Settlement Agreement § 8. Per Section 10.4 of the Plan, "nothing in the Plan, the Plan Documents, [or] the Confirmation Order . . . shall in any way operate to, or have the effect of, impairing: (a) any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect under any Asbestos PI Insurance Contracts."  Plan § 10.4; *see also* Plan § 14.8 (providing that the Plan is binding on PENAC, THAN and the Trust).  Pursuant to the Plan's definitional provisions, (1) the Plan Documents include an "Asbestos Records Cooperation Agreement" ("Cooperation Agreement") between PENAC, THAN and the Trust; (2) each Plaintiff insurance company is an Asbestos Insurance Entity; *and* (3) the Settlement Agreement is an Asbestos PI Insurance Contract.  Plan §§ 1.11, 1.14, 1.23, 1.30, 1.85, 1.109; Plan, Ex. G, § IX.  Count I of the Amended Complaint alleges, *inter alia*, that PENAC and THAN have breached Section 8 of the Settlement Agreement, and Counts II and III allege that all three Defendants have breached Section 10.4 of the Plan.  Am. Compl. ¶¶ 100, 109, 119.  For reasons explained below, whether *vel non* these alleged breaches occurred depends, at least in part, on what an "audit" must include to satisfy Plaintiffs' audit right under Section 2.3 of the Settlement Agreement which, in turn, depends on the proper construction of Section 2.3's first sentence.

[21] Settlement Agreement § 2.3.

payment obligations under the Settlement Agreement on account of the Trust's

allegedly improper calculation or payment of claims, with two exceptions:

> (a) If Plaintiffs "determine based on their review and/or audit" that one or more of the Trust's payments to cancer claimants "were miscalculated due to an accounting error," Plaintiffs may notify the trustees of the accounting error and request that they review the matter. "If the [trustees] agree that there has been an accounting error, Plaintiffs will be credited the amount of any overpayment by [Plaintiffs] resulting from the accounting error . . . ."[22]

> (b) If Plaintiffs "have reason to believe" that the Trust has paid one or more fraudulent cancer claims, "such that the Trust . . . has a right to recover back payments made" on those claims, Plaintiffs may bring evidence of such fraud to the trustees' attention and request that they review the evidence. If the trustees "agree that the evidence supports" Plaintiffs' fraud claim or otherwise "warrants further investigation" and the Trust "ultimately recovers back all or some of" the amounts paid toward fraudulent cancer claims, "PENAC will credit [Plaintiffs] with the applicable percentage . . . of the recovered amount . . . ."[23]

Sections 2.4(a) and (b) also provide that "PENAC agrees to cooperate with

[Plaintiffs] in obtaining any pertinent information."[24]

### C.     The Parties' Interactions Following the *AIU I* Decision

In *AIU I*, the Court held, *inter alia*, that Section 2.3 of the Settlement

Agreement "provides [Plaintiffs] with a broad audit right that is not limited to only

---

[22] Settlement Agreement § 2.4(a).

[23] Settlement Agreement § 2.4(b).

[24] Settlement Agreement § 2.4(a)–(b).

verifying that the Trust's stated payments and distributions were actually made."[25]

The Court cautioned, however, that its decision "should [not] be construed as directing what an audit must include to satisfy [Plaintiffs' audit] right."[26]

Following *AIU I*, Plaintiffs moved to compel the Trust's production of "preliminary information" to facilitate their audit of the Trust's payments and distributions.[27] On February 8, 2016, the Court ordered the Trust to produce certain "initial information for each cancer claimant whose cancer claim ha[d] been paid by the Trust" as of that date.[28] Thereafter, on March 7, 2016, the Trust "produced a spreadsheet to Plaintiffs containing [the specified] information regarding 7,538 cancer claims paid by the [Trust] since its inception."[29] After reaching agreement with the Trust on an audit protocol (the "2016 Audit Protocol"), Plaintiffs selected

---

[25] *AIU I*, 2015 WL 3526976, at *8.

[26] *Id.*

[27] Am. Compl. ¶ 80; Dkt. 85.

[28] Dkt. 110 ¶ 1; *see also* Am. Comp. ¶ 80. This "initial information" comprised (1) the claimant's name and date of birth; (2) the last four digits of the claimant's social security number; (3) whether the claimant's claim was "Exigent Health, Hardship and/or Extraordinary"; (4) the law firm representing the claimant; (5) the claimant's malignant disease category; and (6) the start date and end date for the claimant's occupational exposure to asbestos. Dkt. 110 ¶ 1.

[29] Am. Compl. ¶ 81; *see also* Dkt. 121 ¶ 10.

9

584 of those claims "to be the subject of [their] initial annual audit," and then conducted that audit on June 21–24 and July 25, 2016.[30]

Plaintiffs allege that "[t]he materials reviewed during the initial audit raised questions [regarding] possible payment miscalculations . . . and whether certain claims paid by the [Trust] were based on fraudulent information."[31] Plaintiffs raised these concerns with the Trust in a letter dated May 9, 2017.[32] In response, the Trust stated that Plaintiffs had not provided "evidence or a sufficient basis for further investigation."[33] Plaintiffs, in turn, advised the Trust that they "strongly disagree[d]" with the Trust's assessment; that "there is substantial evidence of payment miscalculations and/or fraud, all . . . of which is in the Trust's sole possession and control"; and that such evidence "more than justifies cooperation and further investigation by the Trust."[34] The Trust replied that if Plaintiffs were

---

[30] Am. Compl. ¶ 81; Dkt. 121 ¶ 10. In agreeing to the 2016 Audit Protocol, Plaintiffs "reserve[d] the right to seek relief from the Court [if] any contested issues ar[o]se during the course of the audit . . . [and as necessary] to obtain and assure preservation of any evidence necessary in connection with [P]laintiffs' rights under the Settlement Agreement . . . ." App. to Trust's Opening Br. in Supp. of its Mot. to Dismiss or, in the Alternative, for Summ. J. ("App. to TOB"), Vol. I, Tab 3.F (May 6, 2016 Letter from Plaintiffs' Counsel to the Trust's Counsel) at 2.

[31] Am. Compl. ¶¶ 83–84.

[32] App. to TOB, Vol. I, Tab 3.I (Plaintiffs' May 9, 2017 Letter).

[33] App. to TOB, Vol. I, Tab 3.J (Trust's Reply Letter) at 5.

[34] App. to TOB, Vol. I, Tab 3.K (Plaintiffs' Reply Letter) at 6.

attempting to raise "concerns about the extent of the audit materials [they were] provided for review," their concerns came too late since the 2016 Audit Protocol—to which Plaintiffs agreed and with which the Trust complied—"specified, in clear terms, the audit materials that the Trust would make available for [Plaintiffs'] review."[35]

According to Plaintiffs, the 2016 Audit Protocol does not capture the full scope of their audit right under the Settlement Agreement, and their agreement to that protocol in no way limits their audit right. Moreover, Plaintiffs maintain that their initial audit remains incomplete "because [their] questions [as to] fraud and payment miscalculations remain unanswered."[36]

## D. Procedural History

Plaintiffs filed their Amended Complaint on April 20, 2017. As noted, the Amended Complaint contains six counts, five of which relate to Plaintiffs' audit right under the Settlement Agreement.[37] PENAC and THAN have moved to dismiss

---

[35] App. to TOB, Vol. I, Tab 3.L (Trust's Sur-Reply Letter) at 1.

[36] Pls.' Br. in Opp'n to PENAC and THAN's Mot. to Dismiss and the Trust's Mot. to Dismiss or, in the Alternative, for Summ. J. and in Supp. of Pls.' Cross Mot. for Summ. J. 3 (July 3, 2017) ("POB").

[37] Am. Compl. ¶ 140. Count VI of the Amended Complaint requests a declaration as to "the nature and extent of Plaintiffs' [offset-related] rights under Section 2.4(a) and (b) of the Settlement Agreement," and specific enforcement of those rights as against PENAC and the Trust. Am. Compl. ¶¶ 145–46.

11

Counts I, II, V and VI of the Amended Complaint under Chancery Rule 12(b)(1) and 12(b)(6). The Trust has moved to dismiss Counts III, IV and VI under Chancery Rule 12(b)(6) or, in the alternative, for summary judgment on those Counts, and to dismiss Count V as moot or, alternatively, under Chancery Rule 12(b)(6). Finally, Plaintiffs have cross-moved for summary judgment on Counts V and VI.

## II. ANALYSIS

The parties' current dispute reduces to two issues:

1. What must an "audit" include to satisfy Plaintiffs' audit right under the Settlement Agreement?

2. If an audit conducted by Plaintiffs leads Plaintiffs to question whether the Trust has made payment miscalculations or paid fraudulent claims (or both), and Plaintiffs then raise such questions with the Trust's trustees, does the Settlement Agreement require the Trust to investigate and attempt to resolve those questions?

For the reasons that follow, I have concluded that (1) the Settlement Agreement is ambiguous as to what an audit must include to satisfy Plaintiffs' audit right; *and* (2) the Settlement Agreement does not require the Trust to investigate or resolve Plaintiffs' questions as to possible payment miscalculations or the payment of fraudulent claims by the Trust. The decision to investigate such questions, or not, is committed to the sole discretion of the trustees.

12

### A. Standards Governing the Parties' Motions

The standards governing the parties' motions are well settled. On a motion to dismiss under Chancery Rule 12(b)(1), "[t]he plaintiff bears the burden of establishing th[e] Court's [subject matter] jurisdiction" over the challenged claim(s).[38] "[I]f it appears from the record that the Court does not have subject matter jurisdiction over the claim," the Court will dismiss the claim.[39]

On a motion to dismiss under Chancery Rule 12(b)(6), "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[40]

Finally, on a motion for summary judgment, the court may grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[41] "When the issue before the

---

[38] *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *2 (Del. Ch. Feb. 10, 2015) (internal quotation and citation omitted).

[39] *AFSCME Locals 1102 & 320 v. City of Wilm.*, 858 A.2d 962, 965 (Del. Ch. 2004) (citation omitted).

[40] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[41] Ct. Ch. R. 56(c).

13

Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous."[42]

## B. The Controversy Relating to the Precise Scope of Plaintiffs' Audit Right Under the Settlement Agreement Is Not Moot

Count V of the Amended Complaint seeks a declaration as to the scope of Plaintiffs' audit right under the Settlement Agreement. Defendants contend that Count V is moot because the scope of Plaintiffs' audit right has already been determined—by *AIU I* and by the parties in the 2016 Audit Protocol. According to Defendants, "Plaintiffs have had their audit" in keeping with these set parameters and the matter should now be put to rest.[43] Plaintiffs disagree. According to Plaintiffs, neither the Court's *AIU I* decision nor the 2016 Audit Protocol definitively determined "what an audit must include to satisfy [Plaintiffs' audit] right."[44] Thus,

---

[42] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[43] *See* PENAC and THAN's Br. in Supp. of Their Mot. to Dismiss 21 (June 9, 2017) ("P-T Opening Br."). *See also* Trust's Opening Br. in Supp. of its Mot. to Dismiss or, in the Alternative, for Summ. J. 38 (June 9, 2017) ("TOB") ("The common thread running through [Counts III–V] of the Amended Complaint is [Plaintiffs'] bewilderingly selective indifference to last year's resolution of the scope of [their] audit right . . . ."); TOB at 40 ("Section 2.3 is [Plaintiffs'] audit right and, as noted, the audit has happened."); TOB at 42 (positing that the Court's *AIU I* decision, together with Plaintiffs' agreement to the 2016 Audit Protocol, "ultimately settled the precise scope of [Plaintiffs'] audit right"); TOB at 40 ("[Plaintiffs] already ha[ve] exercised [their audit] right on terms to which [they] agreed."); P-T Opening Br. at 22 (to the same effect); P-T Opening Br. at 21 ("[B]ecause [Plaintiffs' audit] rights have been determined and Plaintiffs have had their audit, Count Five is now moot."); TOB at 42 ("With the scope of [Plaintiffs'] audit right now settled," Count V is moot.).

[44] *AIU I*, 2015 WL 3526976, at *8.

14

Plaintiffs argue, there is an actual, justiciable controversy as to the precise scope of their audit right under the Settlement Agreement.

For this court to exercise jurisdiction over a particular dispute, the legal issue(s) in dispute must be "amenable to a judicial resolution."[45]  "If a grant of relief 'cannot have any practical effect on the existing controversy,' the dispute is moot."[46] A dispute "that has become moot normally will be dismissed."[47]  Of course, "if the alleged injury still exists despite the occurrence of intervening events, a justiciable controversy remains, and the mootness doctrine will not operate to deprive a court of jurisdiction to hear the case."[48]

Notably, Section 2.3 entitles Plaintiffs to "audit payments and distributions made by the Trust" once *per year*.[49]  Thus, absent a definitive judicial construction of Section 2.3 as to the precise scope of Plaintiffs' audit right—an issue as to which

---

[45] *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997) ("A proceeding may become moot . . . if the legal issue in dispute is no longer amenable to a judicial resolution . . . ."); *NAMA Hldgs, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 435 (Del. Ch. 2007) ("The doctrine of mootness requires a court to dismiss a claim 'if the substance of the dispute disappears due to the occurrence of certain events following the filing of an action.'") (quoting *Multi–Fineline Electronix, Inc. v. WBL Corp. Ltd.*, 2007 WL 431050, at *8 (Del. Ch. Feb. 2, 2007)).

[46] *NAMA Hldgs.*, 922 A.2d at 435 (quoting *The Library, Inc. v. AFG Enters., Inc.*, 1998 WL 474159, at *2 (Del. Ch. July 27, 1998)).

[47] *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997).

[48] *NAMA Hldgs.*, 922 A.2d at 435.

[49] Settlement Agreement § 2.3.

the Settlement Agreement is silent[50]—the parties' current dispute likely will recur

year after year in connection with future audits.[51] The Court's *AIU I* decision did

not specifically identify "what an audit must include to satisfy [Plaintiffs' audit]

right."[52] Nor did Plaintiffs' agreement to the 2016 Audit Protocol "ultimately

settle[] the precise breadth of [their] audit right."[53] Therefore, as discussed in more

detail below, the parties' current dispute as to the precise scope of Plaintiffs' audit

right under the Settlement Agreement is an actual, justiciable controversy.[54]

## C. The Settlement Agreement is Ambiguous as to the Precise Scope of Plaintiffs' Audit Right

"In deciding a motion to dismiss [pursuant to Chancery Rule 12(b)(6)], the

trial court cannot choose between two differing reasonable interpretations of

---

[50] *See AIU I*, 2015 WL 3526976, at *8; *see generally* Settlement Agreement.

[51] *Cf. NAMA Hldgs.*, 922 A.2d at 435 ("[I]f the alleged injury still exists despite the occurrence of intervening events, a justiciable controversy remains . . . . ").

[52] *AIU I*, 2015 WL 3526976, at *8.

[53] TOB at 42. Here, I cannot reasonably conclude that Plaintiffs' (qualified) agreement to a particular audit protocol for a single audit constitutes a manifestation of assent permanently to exclude from the scope of Plaintiffs' audit right any information outside the scope of that particular protocol. *See* App. to TOB, Vol. I, Tab 3.F at 2.

[54] *Gen. Motors Corp.*, 701 A.2d at 823; *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("The proper construction of any contract . . . is purely a question of law."); *805 Third Ave. Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 447 (N.Y. 1983) ("Interpretation of [a] contract is a legal matter for the court.").

16

ambiguous [contractual] provisions."[55]  Likewise, on cross-motions for summary judgment, if the cross-movants both offer reasonable interpretations of the operative contractual language, the court "may, in its discretion, deny summary judgment [so that it may] . . . inquire into or develop more thoroughly the facts at trial in order to clarify the law or its application."[56]

While Counts I–IV of the Amended Complaint state separate claims, whether any of those claims are viable depends fundamentally on what an audit must include to satisfy Plaintiffs' audit right, which in turn depends on the proper construction of Section 2.3 of the Settlement Agreement.[57]  Plaintiffs acknowledge as much in

---

[55] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

[56] *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCMR (Del. Ch. Oct. 31, 2016) (ORDER) (citing *Alexander Indus., Inc. v. Hill*, 211 A.2d 917 (Del. 1965)).

[57] Specifically, Count I of the Amended Complaint alleges (1) that PENAC and THAN have breached Sections 2.3 and 8 of the Settlement Agreement "by refusing to allow Plaintiffs to exercise their right to conduct a commercially reasonable audit of the [Trust] unless Plaintiffs agree to . . . conditions [not contained in] the Settlement Agreement," and (2) that "PENAC has breached Section 2.4 of the Settlement Agreement by refusing to cooperate with Plaintiffs in obtaining information pertinent to" the Trust's miscalculation of claim payments and payment of fraudulent claims.  Am. Compl. ¶¶ 98–100.  Counts II and III of the Amended Complaint allege that all three Defendants have breached Section 10.4 of the Plan, in that Defendants' entry into (or reliance on) the Cooperation Agreement has operated to impair Plaintiffs' audit right under the Settlement Agreement. *Id.* ¶¶ 109, 119.  Count IV of the Amended Complaint alleges that the Trust has tortiously interfered with Plaintiffs' audit right under the Settlement Agreement "by refusing to allow Plaintiffs to exercise their right to conduct a commercially reasonable audit of the [Trust]" unless Plaintiffs agree to conditions not contained in the Settlement Agreement. *Id.* ¶ 129. If Plaintiffs' construction of Section 2.3 of the Settlement Agreement is correct, Counts I, II and III adequately plead the requisites of a claim for breach of contract under New York law, *see AIU I*, 2015 WL 3526976, at *9–11, and Count IV adequately pleads the requisites of a claim for tortious interference with contract under New York law.  *See id.* at *11.

17

Count V of the Amended Complaint, which seeks a declaration of Section 2.3's proper construction with respect to "the nature and extent of" Plaintiffs' audit rights.[58]

The Settlement Agreement is governed by New York law.[59] "Like Delaware, New York follows traditional contract law principles that give great weight to the parties' objective manifestations of their intent in the written language of their agreement."[60] Thus, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[61] A written agreement "is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion[.]'"[62] Contractual language is ambiguous only if the disputed language is

---

And, as explained below, it is at least reasonably conceivable that Plaintiffs' construction of Section 2.3 is correct.

[58] *See* Am. Compl. ¶¶ 138–40.

[59] Settlement Agreement § 18.  The Plan is also governed by New York law.  Plan § 14.1.

[60] *In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 54 (Del. Ch. 2001); *accord Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. The best evidence of what parties to a written agreement intend is what they say in their writing.") (internal quotation and citations omitted).

[61] *Greenfield*, 780 N.E.2d at 170 (citations omitted).

[62] *Id.* at 170–71 (citation omitted).

"reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[63] Whether contractual language is ambiguous is a question of law for the court to decide.[64]

After carefully reviewing Section 2.3, and considering the parties' competing constructions of that provision, I am satisfied that both constructions are reasonable. Thus, the provision is, by definition, ambiguous.[65] To repeat, Section 2.3's operative language reads: "[Plaintiffs] shall have the right to audit payments and distributions made by the Trust at their own expense, no more than once per year."[66] The operative term "audit" is undefined, and the Settlement Agreement says nothing of what information must be made available to Plaintiffs to satisfy their audit right.[67]

Under Plaintiffs' construction of Section 2.3, they are entitled to access (and audit) information concerning the Trust's calculation of payments to cancer claimants, including how the Trust calculated particular claim values for claims liquidated through its Individual Review process (the "IR Process"). This is a

---

[63] *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 869 N.Y.S.2d 511, 516 (App. Div. 2008) (internal quotation and citation omitted), *aff'd,* 920 N.E.2d 359 (N.Y. 2009).

[64] *See, e.g.*, *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (N.Y. 2009) ("Whether a contract is ambiguous is a question of law . . . .").

[65] *VLIW Tech.*, 840 A.2d at 615.

[66] Settlement Agreement § 2.3.

[67] *See generally* Settlement Agreement.

19

reasonable construction of Section 2.3's operative language. The word "audit" carries a confirmatory connotation.[68] An "audit" of reported payments, therefore, might reasonably be understood to denote a process whereby the auditor(s) (*i.e.*, Plaintiffs) may confirm how the reported payments were calculated so that they can confirm that the calculations are, in fact, correct.[69] From this, it follows that a "proper" audit of reported payments would require access to information concerning how the auditee (*i.e.*, the Trust) calculated particular payment amounts.[70] Accordingly, it is reasonable to construe an "audit" of the Trust's reported claim payments to require access to information concerning how the Trust calculated particular claim values for claims liquidated through the IR Process.

Defendants offer a different (but also reasonable) construction of Section 2.3's operative language. According to Defendants, nothing in Section 2.3 "grant[s]

---

[68] *See, e.g.*, *Aron v. Gillman*, 128 N.E.2d 284, 287 (N.Y. 1955) ("[T]he very purpose of an audit is to verify and reconcile the book entries of a business according to proper accounting practice, and to see that they are accurate."); *Audit*, *Webster's New World College Dictionary* (4th ed. 2010) ("A formal, often periodic examination and checking of accounts or financial records to verify their correctness."); *Audit*, *Random House Webster's Unabridged Dictionary* (2d ed. 2005) ("to examine (accounts, records, etc.) for purposes of verification"); *Bianco v. Bianco*, 830 N.Y.S.2d 21, 23 (App. Div. 2007) ("[I]t is common practice for courts to refer to the dictionary in determining plain meaning.") (citation omitted).

[69] *See Aron*, 128 N.E.2d at 287; *Albert A. Volk Co. v. Cauldwell-Wingate Co.*, 70 N.Y.S.2d 662, 666 (App. Div. 1947) ("Inquiry to ascertain the true situation with respect to financial matters beyond a mere superficial examination of books is essential to a proper audit.").

[70] *See Albert A. Volk Co.*, 70 N.Y.S.2d at 666.

Plaintiffs the right to [audit] . . . the Trust's proprietary [IR] [P]rocess . . . or its reasoning for paying particular claim amounts."[71]  This, too, is a reasonable construction of Section 2.3.  The provision rather conspicuously does not specify what information concerning "payments and distributions made by the Trust" must be furnished to Plaintiffs when they exercise their audit right.[72]  If the contracting parties intended that such information should include proprietary details of the Trust's IR Process for each cancer claim paid by the Trust,[73] it is reasonable to expect that they would have expressed that intent in the Settlement Agreement.  Yet, again, the Settlement Agreement is silent.[74]

---

[71] PENAC and THAN's Reply Br. in Supp. of Their Mot. to Dismiss and in Opp. to Pls.' Cross Mot. for Summ. J. 12 (Aug. 1, 2017); Trust's Reply in Supp. of its Mot. to Dismiss and Response Opposing Pls.' Cross Mot. for Summ. J. 11–12 (Aug. 1, 2017) ("TRB").

[72] Settlement Agreement § 2.3; *see generally* Settlement Agreement.

[73] As noted, for Asbestos PI Claims liquidated via the IR Process, the Trust's claim valuation calculus takes into account "the historic liquidated values of other similarly-situated claims in the tort system for the same Disease Level" and "all of the factors that affect the severity of damages and values within the tort system."  TDP § 5.3(b)(2). The Trust's methodology for parsing and evaluating these factors is proprietary, and they understandably wish not to share it with Plaintiffs or others. *See* Trust's Mot. for Protective Order with Respect to Outstanding Discovery and to Stay Further Discovery Pending a Discovery Conference with the Court ¶ 22 (Nov. 18, 2016) (Plaintiffs seek information "that [is] intrinsically and highly proprietary, regarding, essentially, how . . . the Trust [and its claims processor] 'grade' claims. The subject areas include . . . the identification of products for which THAN (and now the Trust) have legal responsibility; the process by which some claims were approved in excess of the 'Scheduled Values'; [and] standards for assessing actual or potential limitations bars[.]").

[74] For instance, the Settlement Agreement makes no reference to "Individual Review" of asbestos-related cancer claims, to "Disease Levels" or to the "Scheduled Value" (or "Maximum Value") indicated for particular Disease Levels; nor does it express the

Moreover, given that "[t]he Trust's claims grading process is the centerpiece of a structured settlement process fashioned . . . as an alternative to [tort] litigation," disclosure of "the Trust's internal processes [c]ould . . . make it more difficult for the Trust to resolve claims in a fair and expeditious manner."[75]  In any event, insofar as Plaintiffs suspect that the Trust has paid fraudulent claims or miscalculated claim payments (due to accounting error), Plaintiffs' sole remedy under the Settlement Agreement is to notify the Trust's trustees of Plaintiffs' concern(s) and request that the trustees review the matter.[76]  Recognizing Plaintiffs' limited remedy in this regard, it would be reasonable to exclude the Trust's proprietary information from the scope of Plaintiff's audit right under the Settlement Agreement.

In the present procedural posture, the Court is unable to choose between the parties' competing reasonable interpretations of the ambiguous contractual language

---

relevant underlying concepts using different language.  *See generally* Settlement Agreement.  On one hand, it is not surprising that the Settlement Agreement makes no reference to defined terms in the TDP, given that the Settlement Agreement was drafted and executed prior to the finalization and confirmation of the Plan.  *Id.* at Signature Pages; Am. Compl. ¶ 16.  On the other hand, if the parties to the Settlement Agreement intended that Plaintiffs should have the right to audit proprietary details of the Trust's IR Process, it would be reasonable to expect that they would identify the relevant conceptual antecedents in the writing memorializing the audit right.

[75] TRB at 12.

[76] *See* Settlement Agreement § 2.4.

that is at the heart of their dispute.[77]  Thus, the parties' dispositive motions must be denied with respect to Counts I–V of the Amended Complaint.

### D.  Count VI of the Amended Complaint Must Be Dismissed

Plaintiffs allege in Count VI that there is an actual, justiciable controversy regarding (1) "Plaintiffs' entitlement to a determination by the [Trust] . . . that the [Trust] has made payment miscalculations and . . . paid claims based on fraudulent information";[78] *and* (2) "the nature and extent of Plaintiffs' [offset] rights [in respect of PENAC] under Sections 2.4(a) and (b) of the Settlement Agreement."[79]  I address each allegation in turn.

*First*, as a matter of law, the Settlement Agreement does not entitle Plaintiffs to a determination by the Trust that the Trust has, in fact, miscalculated claim payments or paid fraudulent claims.  The Trust is a stranger to the Settlement Agreement;[80] thus, Plaintiffs do not have any contractual rights against the Trust under that Agreement. [81]  That being so, Plaintiffs "cannot, under

---

[77] *See VLIW Tech.*, 840 A.2d at 615; *United Rentals*, 937 A.2d at 830.

[78] Am. Compl. ¶ 143.

[79] Am. Compl. ¶ 142.

[80] Settlement Agreement § 1.18 (defining the term "Parties" in the Settlement Agreement; the term includes Plaintiffs, PENAC and THAN but does not include the Trust).

[81] *See Bartsch v. Bartsch*, 388 N.Y.S.2d 347, 348 (App. Div. 1976) ("[P]arties to a contract cannot, under its terms, impose any liability upon a stranger to that contract.").

[the Settlement Agreement's terms], impose any liability upon [the Trust]."[82] And Plaintiffs have not pled that there is some other legal instrument that evidences "Plaintiffs' entitlement to a determination by the [Trust] . . . that the [Trust] has made payment miscalculations [or] . . . paid claims based on fraudulent information."[83]

*Second*, Plaintiffs have failed to plead the existence of a justiciable controversy as to the nature or extent of their alleged offset rights under Section 2.4 of the Settlement Agreement. Under Section 2.4, Plaintiffs' offset rights are subject to several conditions precedent, including:

1. Plaintiffs must inform the Trust's trustees of Plaintiffs' belief that the Trust (i) miscalculated certain claim payments due to accounting error; or (ii) paid one or more fraudulent claims;[84] *and*

2. The trustees must agree that the Trust has (i) miscalculated the specified claim payments due to accounting error; or (ii) been defrauded with respect to the claim (or claims) specified.[85]

Here, Plaintiffs have not pled that these conditions precedent have been satisfied.[86] Thus, Plaintiffs have failed to plead the existence of a justiciable controversy as to the nature or extent of their offset rights under Section 2.4 of the Settlement

---

[82] *Id.*

[83] *See generally* Am. Compl.

[84] Settlement Agreement § 2.4.

[85] *Id.* Moreover, in the case of fraud, the Trust must actually "recover[] back all or some of the amounts paid" on fraudulent cancer claims. *Id.* § 2.4(b).

[86] *See generally* Am. Compl.

24

Agreement.[87]  Count VI is dismissed for failure to state a claim upon which relief can be granted.

## III.  CONCLUSION

For the foregoing reasons, the parties' respective motions with respect to Counts I through V of the Amended Complaint are DENIED.  Defendants' motions to dismiss Count VI of the Amended Complaint are GRANTED.  The parties shall confer and, within ten (10) days, submit a schedule for the development of extrinsic evidence as appropriate to assist the Court in its construction of Section 2.3 of the Settlement Agreement.

**IT IS SO ORDERED.**

---

[87] Following the audit, Plaintiffs raised concerns regarding "payment miscalculations and/or fraud" with the Trust.  The trustees, for their part, have (repeatedly) disagreed with Plaintiffs' assessments.  *See* App. to TOB, Vol. I, Tabs 3.I–3.L.  The Settlement Agreement affords Plaintiffs no remedy in the event of such disagreement beyond the exercise of their audit rights.  *See* Settlement Agreement § 2.4.  Given this limitation, it is all the more appropriate that Plaintiffs' bargained-for audit rights, such as they are, be fully realized so that Plaintiffs may make their best case to the trustees and, in turn, the trustees (neutrals in this dispute) may make fully informed judgments.