**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted: June 18, 2025
Date Decided: August 6, 2025

Sean A. Meluney, Esq.
William M. Alleman, Jr., Esq.
Meluney Alleman & Spence, LLC
1143 Savannah Road, Suite 3-A
Lewes, DE 19958

David E. Wilks, Esq.
D. Charles Vavala, III, Esq.
Anna L. Fiscella, Esq.
Wilks Law, LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

RE: *Bunting Macks LLC v. D.R. Horton, Inc. – New Jersey*,
C.A. No. 2025-0272-BWD

Dear Counsel:

Plaintiff Bunting Macks LLC ("Bunting Macks") seeks to exercise self-help rights under a joint development and reciprocal easement agreement. Bunting Macks claims it is entitled to install a sewer forcemain under real property owned by defendant D.R. Horton, Inc. – New Jersey ("Horton"). Bunting Macks wishes to install a forcemain that is ten inches in diameter, but Horton contends that the parties' agreement requires installation of a forcemain only six inches in diameter. This letter opinion concludes that, under the agreement, the parties' dispute must be arbitrated.

## I.  BACKGROUND

### A.  The Purchase Agreement

This case represents the latest installment in ongoing litigation between Bunting Macks and Horton over the development of real property in Selbyville, Delaware.  In 2021, Bunting Macks and Horton entered into a land purchase contract (the "Purchase Agreement") under which Horton agreed to purchase, and Bunting Macks agreed to sell, real property (the "Property") to be developed into a residential community called "Coastal Villages."  Verified Compl. [hereinafter Compl.] ¶ 4, Dkt. 1.

The Purchase Agreement governed the purchase of the Property in four phases.  *Id.*  On May 3, 2022, Bunting Macks and Horton closed on Phase 1.  *Id.* ¶ 14.  The same day, Bunting Macks and Horton entered into a joint development and reciprocal easement agreement (the "REA") to govern the development of Phases 1 through 4.  *See id.*, Ex. 3 [hereinafter REA].

On January 29, 2024, Horton filed an action in this Court, alleging that Bunting Macks had breached the Purchase Agreement and seeking an order compelling Bunting Macks to specifically perform its obligations under the Purchase Agreement to sell the Phase 2 property "with all contingencies, representations, and warranties met and with all contractually required approvals."  *D.R. Horton, Inc. –*

*N.J. v. Bunting Macks LLC*, 2024 WL 4870606, at *2 n.13 (Del. Ch. Nov. 22, 2024);

*see D.R. Horton, Inc. – N.J. v. Bunting Macks LLC*, 2024 WL 3045169, at *4 (Del.

Ch. June 18, 2024) [hereinafter *Horton I*], *exceptions denied*, 2024 WL 4870606

(Del. Ch. Nov. 22, 2024).  On June 18, I issued a final report, later adopted as an

order of the Court, concluding that the remedy of specific performance was no longer

available to Horton after it elected not to exercise its contractual right to extend the

outside closing date under the Purchase Agreement.  *Horton I*, 2024 WL 3045169,

at *1.  As a result of that ruling, Horton owns Phase 1 but Bunting Macks still owns

Phases 2 through 4.

## B.    The REA

The present dispute concerns Bunting Macks' rights under the REA to install

a sewer forcemain under Phase 1 for the benefit of Phases 2 through 4.  Compl.

¶¶ 58–71.  In short, under the REA, the parties agreed that the owner of Phase 1—

Horton—would construct a forcemain to service the Coastal Villages community,

while the owner of Phase 2—Bunting Macks—would construct a pump station to tie

into the forcemain.  Eventually, the forcemain and pump station will be dedicated to

the Town of Selbyville (the "Town").[1]

---

[1] The REA contemplates that "the [c]ommon [r]oadways, [f]orcemain and the water and
sewer lines will eventually be transferred to the Town of Selbyville."  REA § 3.1.

Section 2.7.1.1 of the REA states that "the Owner of Phase 1 [*i.e.*, Horton] is required to construct, at such Owner's cost, the Forcemain,[2] as located in Phase 1 . . . ." REA § 2.7.1.1. Under Section 2.9 of the REA,

> Until such time as the Forcemain has been publicly dedicated, Horton grants and conveys to the Owner of Phases 2-4, for the benefit of Phases 2-4, a perpetual easement to tie-in to and use the Forcemain to be constructed on Phase 1 in accordance with the Final Phase 1 Plan, provided such rights to tie-in and use of the Forcemain infrastructure shall be in accordance with the Final Phase 2-4 Plans.[3]

*Id.* § 2.9. Section 2.7.1.1 of the REA further states that:

> In the event that the Owner of Phase 1 fails to construct the Forcemain . . . in accordance with the approved Final Phase 1 Plan on or before the later of (i) May 3, 2024, and (ii) the date on which the [Purchase Agreement] terminates with respect to Phase 2, Phase 3 and/or Phase 4, the Owner(s) of Phases 2-4 shall have the right to complete the construction of the Forcemain . . . in accordance with the approved Final Phase 1 Plan, in accordance with the self-help provisions set forth herein.

*Id.* § 2.7.1.1. Article 7 of the REA sets out the "self-help provisions." Section 7.1(a) of the REA states that:

> If, subject to any Unavoidable Delays, as defined in Section 7.2, any Owner (hereinafter the "Defaulting Owner") shall fail to perform or

---

[2] The REA defines "Forcemain" to mean "the forcemain sewer pipe as shown on the Final Phase 1 Plan." REA § 1.1(m). "Final Phase 1 Plan" refers to "the Coastal Villages Phase I Record Plan recorded in the Recorder's Office . . . in Plat Book 367, Page 76." *Id.* at 1.

[3] "Final Phase 2-4 Plans" means "the finally approved site development plans for Phases 2, 3, and 4, as approved by the applicable Governmental Authority, which plans may either be simultaneously approved or approved sequentially following the date hereof." REA § 1.1(l).

abide by any of the provisions, covenants or conditions of the Self Help Designated Sections[4] of this Agreement on its part to be performed at the time and in the manner herein provided for the performance thereof or such Defaulting Owner, in respect of any Sections of this Agreement which requires the diligent pursuance of a course of conduct or a course of work, fails to pursue the same diligently, then in either such event, any other Owner, after thirty (30) business days' notice to the Defaulting Owner, shall have the right, but shall in no event be obligated, to proceed to take such action or make such payment as shall be necessary to cure such default (unless within such period the Defaulting Owner shall cure such default, or in the case of a default which by its nature cannot be cured within such period, the Defaulting Owner shall take such action as is reasonably calculated to commence the curing thereof, and thereafter shall diligently prosecute the curing thereof to completion), all in the name of and for the account of the Defaulting Owner. . . . Prior to any Owner exercising the rights granted in this Section 7.1(a), the Owner intending to exercise such rights shall first provide the Owner upon whose Phase such rights are intended to be exercised with a certificate of insurance. Any Owner availing itself of the rights granted in this Section 7.l(a) shall promptly pay all costs and expenses associated with such work and shall promptly clean the area and restore the affected area to a condition which is substantially equal to or better than the condition which existed prior to the commencement of such work.

*Id.* § 7.1(a).

In Section 7.1(b) of the REA, the parties agreed to arbitrate certain disputes

concerning the self-help provisions:

If, however, notwithstanding the contention by such other Owner contained in such notice, or made by such other Owner in acting pursuant to the third sentence of the preceding paragraph, the

---

[4] The "Self Help Designated Sections" include Sections 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 2.10, 2.11, Article 3, Article 6, and Article 7. REA § 1.1(cc).

> Defaulting Owner shall contend that it has not in fact failed to perform, or diligently to pursue a course of conduct or work in respect of, the provision, covenant or condition in question, or that the work performed by the other Owner was excessive in cost or extent (such contention to be made promptly if to be so made), then, if the matter is not agreed upon by the other Owner and the Defaulting Owner within sixty (60) days, ***the matter shall be submitted to arbitration*** for determination in accordance with the provisions of Section 7.1(c) of this Agreement and the Defaulting Owner shall not be required to make any payment provided for in this Article, until the arbitration proceedings are concluded.

*Id.* § 7.1(b) (emphasis added). Section 7.2(a) of the REA separately states that "[e]ach Owner may proceed, at law or in equity, to prevent the occurrence or continuance of any violation of any provision of this Agreement . . . ." *Id.* § 7.2(a).

Section 2.7.1.3 of the REA provides that, "[i]n order to develop Phase 2, the Owner of Phase 2 [*i.e.*, Bunting Macks] shall be required to construct, at such Owner's cost, for the use of each Owner and for the benefit of and as an appurtenance to each Phase, the Pump Station[5] in Phase 2 in accordance with the Final Phase 2-4 Plans." *Id.* § 2.7.1.3. Under Section 2.6 of the REA, "[t]he Owner of Phase 2 grants and conveys to the Owners of Phases 3 and 4, an access and utility easement to tie-in and use the Pump Station for the benefit of Phases 3 and 4, in accordance with the Final Phase 2-4 Plans." *Id.* § 2.6. In addition, under Section 2.10 of the REA,

---

[5] The REA defines "Pump Station" as "that certain sewer pump station as shown on the Plan, to be constructed in accordance with the Final Phase 2-4 Plans." REA § 1.1(y).

> Upon completion of the Pump Station in accordance with Section 2.7.1.3, and until such time as the Pump Station has been publicly dedicated, the Owner of Phase 2 grants and conveys to the Owner(s) of Phase 1, Phase 3 and Phase 4 . . . a perpetual easement to tie-in to and use the Pump Station, as constructed in accordance with the Final Phase 2-4 Plans, provided such rights to tie-in and use of the Pump Station infrastructure shall be in accordance with the Final Phase 1 Plan and the Final Phase 2-4 Plans.

*Id.* § 2.10.

### C. Horton Fails To Construct A Forcemain And Bunting Macks Invokes Self-Help Rights Under The REA.

On April 25, 2022, the Town approved plans for Phase 1 that included a Forcemain of six inches in diameter. *See* Rule 56(f) Aff. of D. Charles Vavala, III [hereinafter Vavala Aff.], Ex. A at 4, Dkt. 24.[6] On August 7, 2023, however, the Town approved plans for Phase 2 that included a Forcemain of *ten* inches in diameter to service a regional pump station. Compl. ¶¶ 32, 34.[7]

In late 2024, Horton attempted to install a six-inch Forcemain, but the town engineer halted construction, explaining that the Town required a ten-inch Forcemain. *See* Vavala Aff., Ex. A at 3–4. On December 20, 2024, Horton requested that the town solicitor "advise the Town Engineer that the Developer

---

[6] Those plans were recorded on May 3, 2022. *See* Compl., Ex. 1; *id.*, Ex. 2 at C520–C523.

[7] Those plans were recorded on August 16, 2023. *See* Compl., Ex. 5; *id.*, Ex. 6 at C520–C523.

Agreement and approved Construction Plans require Horton to install a 6-inch force main on the Property and not a 10-inch force main." *Id.* at 4.

On January 30, 2025, Bunting Macks notified Horton that Bunting Macks intended to exercise self-help rights under Section 7.1 of the REA to install a ten-inch Forcemain at its own cost. Compl., Ex. 8. On February 19, Horton responded that Bunting Macks "may not exercise self-help rights or enter Horton's property to increase the Forcemain." *Id.*, Ex. 12.

On February 25, the town solicitor confirmed to Horton that the Town required a ten-inch Forcemain but suggested that "any issue that DR Horton may have had with the size of the force main to be installed in Coastal Villages has been resolved since Bunting Macks will be installing the force main at its sole cost . . . ." Compl. ¶ 54.

### D. Procedural History

On March 11, 2025, Bunting Macks initiated this action through the filing of a Verified Complaint (the "Complaint"). Concurrent with the filing of the Complaint, Bunting Macks moved for expedited proceedings on its forthcoming motion for summary judgment. Dkt. 2. Horton opposed expedition. Dkt. 7. On April 1, Bunting Macks moved for summary judgment and filed its opening brief in support thereof. Dkt. 12. On April 9, Horton moved to dismiss the Complaint. Dkt.

14.[8]   On April 21, the Court denied Bunting Macks' request for expedition, explaining that, "[t]o the extent Bunting Macks' pleadings and motion identify some modicum of threatened irreparable harm in the form of interference with its property rights, the alleged harm does not justify the burden of the expedited schedule Bunting Macks seeks." Dkt. 18. The Court heard oral argument on the pending motions on June 18. Dkt. 33.

## II.   ANALYSIS

Horton has moved to dismiss the Complaint under Court of Chancery Rules 12(b)(1) and 12(b)(6). Horton seeks dismissal on three grounds: (1) the dispute is subject to arbitration; (2) the Court lacks equitable subject matter jurisdiction over the dispute; and (3) the Complaint fails to state a claim upon which relief can be granted. This letter opinion resolves the motion on the first ground for dismissal.

Horton moves to dismiss the Complaint in favor of the arbitration provision in Section 7.1(b) of the REA. "It is well settled that 'Delaware courts lack subject

---

[8] Horton filed its Opening Brief in Support of its Motion to Dismiss on May 5, 2025. Dkt. 22 [hereinafter DOB]. On May 21, Horton filed its Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment. Dkt. 24. Bunting Macks filed its Answering Brief in Opposition to Horton's Motion to Dismiss on May 30. Dkt. 27 [hereinafter PAB]. On June 12, Bunting Macks filed its Reply Brief in Support of its Motion for Summary Judgment. Dkt. 29. Horton filed its Reply Brief in Support of its Motion to Dismiss on June 13. Dkt. 31 [hereinafter DRB].

matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate.'" *Innovation Inst., LLC v. St. Joseph Health Source, Inc.*, 2019 WL 4060351, at *4 (Del. Ch. Aug. 28, 2019, revised Aug. 29, 2019) (quoting *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007)). "A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by the courts." *NAMA Hldgs., LLC*, 922 A.2d at 430 (first citing *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581–82 (Del. Ch. 2006); and then citing *Westendorf v. Gateway 2000, Inc.*, 2000 WL 307369, at *3 (Del. Ch. Mar. 16, 2000)). "However, this presumption will not trump basic principles of contract interpretation[.]" *Id.* (citing *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002)).

The parties agree that arbitrability should be decided by the Court and not by the arbitrator.[9] PAB at 20 n.7. They disagree, however, on whether the claims

---

[9] Arbitrability is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). Contracting parties reserve the question of arbitrability for arbitrators only where (1) "the arbitration clause generally provides for arbitration of all disputes"; and (2) the contract "incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." *Id.* at 80. That is not the case here.

brought in this action fall within the scope of Section 7.1(b) of the REA. The

Delaware Supreme Court has explained that:

> When the arbitrability of a claim is disputed, the court is faced with two issues. First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract.

*Parfi Hldg. AB*, 817 A.2d at 155. The arbitration provision in Section 7.1(b) of the

REA is narrow. It states that:

> If, however, notwithstanding the contention by such other Owner contained in such notice, or made by such other Owner in acting pursuant to the third sentence of the preceding paragraph, the Defaulting Owner shall contend that it has not in fact failed to perform, or diligently to pursue a course of conduct or work in respect of, the provision, covenant or condition in question, or that the work performed by the other Owner was excessive in cost or extent (such contention to be made promptly if to be so made), then, if the matter is not agreed upon by the other Owner and the Defaulting Owner within sixty (60) days, the matter shall be submitted to arbitration . . . .

REA § 7.1(b). In other words, Section 7.1(b) applies only in three narrow

circumstances—when a party invokes the self-help procedures due to a breaching

party's "fail[ure] to perform or abide by any of the provisions, covenants or

conditions of the Self Help Designated Sections[,]"[10] but the breaching party contends that (1) "it has not in fact failed to perform . . . the provision, covenant or condition in question," (2) "it has not in fact failed . . . diligently to pursue a course of conduct or work in respect of, the provision, covenant or condition in question," or (3) "the work performed by the other Owner was excessive in cost or extent[.]" REA § 7.1(b).

Bunting Macks claims that Horton failed to perform its obligations under Section 2.7.1.1 of the REA to construct the Forcemain by May 3, 2024, and seeks to exercise its rights under the self-help provisions in Section 7.1 to construct a ten-inch Forcemain. In response, Horton contends that Bunting Macks is not permitted to act under the guise of self-help rights to construct a Forcemain that is four inches larger than the six-inch Forcemain included in the Final Phase 1 Plan. *See id.* § 2.7.1.1 ("the Owner of Phase 1 is required to construct, at such Owner's cost, the Forcemain"); *id.* § 1.1(m) (defining "Forcemain" to mean "the forcemain sewer pipe as shown on the Final Phase 1 Plan"); Compl. ¶ 54 (confirming the Final Phase 1 Plan reflected a six-inch Forcemain). In other words, Horton objects to Bunting Macks' exercise of self-help rights on the grounds that the work Bunting Macks

---

[10] REA § 7.1(a).

seeks to perform exceeds the extent of what is permitted under the REA. Horton's contention falls within scenario (3) above and must be arbitrated.[11]

According to Bunting Macks, two additional provisions in the REA show that the dispute need not be arbitrated. I disagree. First, Section 7.2(a) of the REA generally permits "[e]ach Owner [to] proceed, at law or in equity, to prevent the occurrence or continuance of any violation of any provision of this Agreement . . . ." REA § 7.2(a). Bunting Macks says that, notwithstanding the arbitration provision, Section 7.2(a) permits Bunting Macks to seek relief in this Court "to prevent the occurrence and continuation of Horton's multiple violations of the REA[,]" including alleged breaches of Sections 2.7.1.1., 2.7.1.3, and 7.1. PAB at 18. Importantly, however, the only violation Bunting Macks seeks to prevent through this action is Horton's interference with Bunting Macks' self-help rights— the precise issue that must be arbitrated under Section 7.1(b) of the REA.[12]

Bunting Macks also points to Section 9.8 of the REA, which states:

> All rights, privileges and remedies afforded to the Owners by this Agreement are cumulative and shall be deemed additional to any and

---

[11] Horton also contends that it is "pursuing a course of conduct or work that would lead to the installation of the Forcemain." DRB at 5.

[12] *See* Compl. ¶ 68 (seeking "a declaration affirming [Bunting Macks'] right to exercise self-help rights to build the Forcemain"); *id.* ¶ 69 (seeking "an injunction preventing Horton from interfering with Bunting Macks' exercise of its self-help rights pursuant to the REA"); *id.* at 22.

> all other remedies to which each of them may be entitled at law or in equity, by statute or otherwise, and shall include the right to restrain by injunction any violation or threatened violation by any Owner of any of the terms, covenants or conditions of this Agreement . . . .

REA § 9.8. As Bunting Macks points out, the Delaware Supreme Court considered similar language in *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76.[13] There, an "arbitration clause beg[an] by requiring arbitration of any controversy arising out of or relating to [an] LLC Agreement[,]" but "continue[d] by expressly authorizing the nonbreaching [m]embers to obtain injunctive relief and specific performance in the courts." *Id.* at 81. The Delaware Supreme Court read that language as a whole to mean that, "despite the broad [arbitration] language at the outset, not all disputes must be referred to arbitration." *Id.*

"'[W]here specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one[,]'" and "'general terms of the contract must yield to more specific terms.'" *Thompson St. Cap. P'rs IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 2025 WL 1213667, at *8 (Del. 2025) (first

---

[13] *Willie Gary* adopted the "majority federal view that reference to the [American Arbitration Association] rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator[,]" but held that the majority federal view did not apply to that case because the arbitration clause did not refer all controversies to arbitration. *Willie Gary, LLC*, 906 A.2d at 80–81. That is not at issue here; as noted above, the parties agree that the Court should decide arbitrability.

quoting *Nucor Coatings Corp. v. Precoat Metals Corp.*, 2023 WL 6368316, at \*10 (Del. Super. Aug. 31, 2023); and then quoting *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019)). Unlike in *Willie Gary*, here, Section 9.8 of the REA does not provide a narrow carve-out to broad arbitration language. Instead, the opposite is true—Section 9.8 broadly permits all remedies "at law or in equity," but Section 7.1(b) provides a narrow exception for disputes concerning self-help rights that must be arbitrated. The present dispute falls within that narrow exception.

## III. CONCLUSION

For the reasons explained above, the parties' dispute over Bunting Macks' exercise of self-help rights under the REA must be arbitrated. The parties should meet and confer on whether this action should be stayed or dismissed in favor of arbitration.[14]

---

[14] The Federal Arbitration Act appears to govern the arbitration provisions in the REA. *See* 10 *Del. C.* § 5702(c) ("Unless an arbitration agreement complies with the standard set forth in subsection (a) of this section for the applicability of the Delaware Uniform Arbitration Act, any application to the Court of Chancery to enjoin or stay an arbitration, obtain an order requiring arbitration, or to vacate or enforce an arbitrator's award shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act [9 U.S.C. § 1 *et seq.*] . . . ."); *see also Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024) (suggesting a stay, as opposed to dismissal, may be appropriate).

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor

cc:     All counsel of record (by File & ServeXpress)